# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*Harrison v. Addington*, **2011 IL App (3d) 100810**

---

| | |
|---|---|
| Appellate Court Caption | ANDRE HARRISON, Plaintiff-Appellant, v. MICHAEL ADDINGTON, JAMES OLSON, ROY DeVAULT, SHERRI MARTIN, JEFF CHISHOLM, STEVE BROCKWAY, MARK DIGNEY and METROE HORNBUCKLE, Defendants-Appellees, (Shawn Maddox, Defendant). |
| District & No. | Third District<br>Docket No. 3-10-0810 |
| Filed | September 6, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action against several of plaintiff's supervisors and fellow employees alleging defamation and intentional interference with plaintiff's employment based on statements that plaintiff sexually assaulted a subordinate and that there was a warrant for his arrest, the entry of summary judgment for defendants was affirmed where the record established that plaintiff did have relationships with subordinates and others, and those relationships created a risk for workplace violence and a risk of financial liability for the employer. |
| Decision Under Review | Appeal from the Circuit Court of Rock Island County, No. 09-L-136; the Hon. James J. Mesich, Judge, presiding. |
| Judgment | Affirmed. |

| | |
|---|---|
| Counsel on Appeal | Stephen T. Fieweger (argued), of Katz, Huntoon & Fieweger, P.C., of Moline, and Cameron Davidson, of Lane & Waterman, LLC, of Davenport, Iowa, for appellant. |
| | Nina G. Stillman (arugued), and Christopher J. Boran, both of Morgan, Lewis, & Bockius, LLP, of Chicago, for appellees. |
| Panel | JUSTICE SCHMIDT delivered the judgment of the court, with opinion. Presiding Justice Carter and Justice O'Brien concurred in the judgment and opinion. |

## OPINION

¶ 1      Appellant-plaintiff, Andre Harrison, appeals the trial court's grant of summary judgment on behalf of appellees-defendants, Michael Addington, James Olson, Roy DeVault, Sherri Martin, Jeff Chisholm, Steven Brockway, Mark Digney and Metroe Hornbuckle.

¶ 2      Counts II and IV of the third amended complaint allege that Olson and DeVault defamed appellant by repeating the false statements that appellant committed a sexual assault and that there was a warrant for Harrison's arrest.

¶ 3      Counts VI through XIII of the third amended complaint allege that Addison, Olson, DeVault, Martin, Chisholm, Brockway, Digney and Hornbuckle each intentionally interfered with appellant's employment by improperly using a company investigation as an opportunity to terminate appellant's employment with Deere & Co.

¶ 4      Counts I, III, and V are not at issue in this appeal. Counts I and V are claims of defamation and intentional interference against Shawn Maddox and are not involved in this appeal. Count III is a claim of defamation against Michael Addington; appellant conceded the motion for summary judgment.

¶ 5      For the reasons that follow, we hold that the trial court correctly granted summary judgment in favor of each defendant, and we affirm the judgment.

¶ 6                                              FACTS
¶ 7                                    I. The Parties on Appeal
¶ 8      Appellant began working for Deere in 1999 as an industrial relations representative. Prior to his termination in 2009, Deere promoted him five times and increased his salary on more than 10 occasions.

¶ 9      When terminated, appellant was the operations manager at John Deere Seeding Group

(Seeding). At that time, each of the defendants was employed by Deere. Their respective titles, and work relationship to appellant, if any, were:

- Roy DeVault, global director, Seeding (appellant's second-level supervisor);

- James Olson, factory manager, Seeding (appellant's immediate supervisor);

- Jeff Chisholm, global director, Deere worldwide security;

- Steven Brockway, regional director, Deere worldwide security;

- Mark Digney, investigator, Deere worldwide security;

- Metroe Hornbuckle, vice president, Deere human resources;

- Michael Addington, director, Deere human resources; and

- Sherri Martin, director, Deere human resources.

¶ 10                    Other Relevant Individuals

- Shawn Maddox, Seeding employee, only remaining defendant after the trial court granted summary judgment to appellees, father of Alissa Maddox;

- Alissa Maddox, Seeding mail room employee, daughter of Shawn Maddox;

- Denny Black, Deere industrial relations administrator;

- Heather Thielbert, Seeding contingent employee, appellant's subordinate (employed by Volt); and

- Angie Soliz, Deere employee, neither a supervisor nor subordinate of appellant; married to an employee appellant managed.

¶ 11                    II. Allegations

¶ 12    On Sunday, August 30, 2009, Shawn Maddox called Denny Black and asked him what would happen if he assaulted someone at work. Black informed him of the consequences. Recognizing an underlying issue, Black asked Shawn why he had asked. Shawn informed Black that his daughter, Alissa Maddox, told him that appellant raped her the previous night. Shawn said that Alissa obtained medical help, filed a report with law enforcement, and either that there was or might be a warrant for appellant's arrest. Shawn also told Black that Alissa claimed appellant was forcing Heather Thielbert to continue a sexual relationship with appellant by threatening her position at Seeding. Shawn explained that Thielbert was at appellant's home at the time of the attack. Black recommended that Shawn contact Seeding global director, DeVault.

¶ 13    Later that day, Shawn Maddox spoke with DeVault, who was out of the country. After speaking with Shawn, DeVault called Seeding factory manager James Olson, appellant's direct supervisor. DeVault told Olson about his conversation with Shawn Maddox, including the allegations made against appellant. Since DeVault was scheduled to be out of the country for the week, Olson agreed to contact Black for more information so that he could formulate a recommendation on how to proceed.

¶ 14    Olson and DeVault agreed that appellant should work from home pending further

investigation. They felt that as a management employee, appellant could easily work offsite. They also determined that Deere worldwide security should be notified, in accordance with company policies that required the reporting of potential incidents of workplace harassment or violence.

¶ 15    On Monday morning, Olson met with appellant at Seeding. He told him that Shawn Maddox had reported to the company that appellant sexually assaulted his daughter and that there was, or might be, an arrest warrant for appellant. Olson told appellant to work from home and that he should take care of any supposed warrant that might exist.

¶ 16    After meeting with appellant, Olson contacted Deere worldwide regional security manager Stephen Brockway; he informed Brockway of the allegations made against appellant. Brockway then assigned worldwide security investigator Mark Digney to conduct an investigation at Seeding.

¶ 17    Later in the morning, Brockway and Digney met with Jeff Chisholm, the global director of worldwide security. Chisholm instructed Digney to focus the investigation on the Seeding work environment due to the concern for potential workplace harassment and violence. Chisholm told Digney to avoid the specific facts of the alleged assault to avoid interfering with any criminal investigation conducted by law enforcement.

¶ 18    Still on Monday, sometime after meeting with Brockway and Digney, Chisholm met with Sherri Martin and Michael Addington, both human resources directors. He informed them of the allegations made against appellant and that Digney was leading the investigation.

¶ 19    At some point on Monday, appellant's security badge was deactivated, denying him access to company facilities.

¶ 20    On Monday, appellant sent Olson an e-mail that stated neither the Moline nor Davenport police department had any record of a complaint against appellant, nor was there a warrant for his arrest. Olson passed this information to Digney. It was later learned that this statement was only half true. Alissa had filed a sexual assault complaint against appellant with the Davenport police.

¶ 21                                    III. Digney's Investigation

¶ 22    Digney investigated the allegations from Monday, August 31, to Wednesday, September 2. On Monday, he first met with Olson and Black to learn about the allegations made against the appellant. Later on Monday, after obtaining approval, Digney began reviewing appellant's work e-mail account. He found two sexually explicit text messages appellant received on his company-issued Blackberry, which he forwarded using his work e-mail account. Initially, he did not know who sent the text messages because the messages only included a phone number.

¶ 23    Digney conducted the following relevant interviews:
- Shawn Maddox, approximately 11 a.m. on September 1;
- Alissa Maddox, approximately 1:30 p.m. on September 1;
- Heather Thielbert, approximately 3:15 p.m. on September 1;
- Angie Soliz, approximately 9:15 a.m. on September 2;

- Appellant, approximately 11:30 a.m. on September 2.

¶ 24    Thielbert admitted that she and appellant were involved in a sexual relationship that began several months earlier. She denied that appellant threatened her position with Deere. She recognized the phone number of the sexually explicit text messages received by appellant as that of Angie Soliz.

¶ 25    Soliz admitted that she had been involved in a "personal" relationship with appellant. She told Digney that she sent the two inappropriate text messages to appellant. The text messages described a sex act she would perform on him. She said that she did not know the phone number she sent the messages to was registered to a Deere phone. These text messages from Soliz were those that Digney found from appellant's Blackberry. Appellant admitted that he was in a relationship with Thielbert. He explained that he forwarded the text messages "to retain[ ] evidence of a consensual relationship." At that time, appellant knew that Soliz was married to a factory worker whom he managed at Seeding.

¶ 26    Appellant also admitted that he had been involved in a sexual relationship with the wife of another Seeding employee. He defined the relationship as "sporadic." Digney understood this to mean the relationship was ongoing, but appellant has since claimed the relationship ended years ago, prior to the woman's marriage to a Deere employee.

¶ 27    Following his interview, appellant sent an e-mail to Addington, who attended the interview. It stated, "I understand the seriousness of the situation. I wanted to assure you I have taken all the steps to end those relationships to better ensure that no future issues arise. *** It was far below the professional standard I expect for myself."

¶ 28                                IV. Digney Reports

¶ 29    On September 2, Digney summarized his findings to Chisholm, Martin, and Addington. He later completed a 21-page formal report. Digney did not make any recommendations regarding disciplinary action; his sole responsibility was to investigate and report.

¶ 30                         V. Decision to Terminate Appellant

¶ 31    On September 2, a conference call occurred among human resources directors Martin and Addington; human resources vice president Hornbuckle; vice president of Deere agriculture and turf Eric Hansotia; and president of Deere agriculture and turf David Everitt.

¶ 32    During the conference call, Addington summarized the results of Digney's investigation. Martin explained that Deere recently terminated managers who had engaged in inappropriate relationships with subordinates. She recommended terminating appellant to remain consistent with the current practice.

¶ 33    Everitt asked Martin to give details of managers who were fired for actions similar to those of appellant. Martin then explained how a manager was recently terminated after a single consensual, sexual encounter with a Deere administrative assistant. Martin went on to explain that during the past several years, Deere started terminating managers who had engaged in such conduct because of the risk of sexual harassment or discrimination claims.

¶ 34    Everitt made the final decision to terminate appellant's employment. On September 3,

Addington and Olson met with appellant and informed him he was terminated due to the information discovered in the investigation.

¶ 35 Any additional facts necessary in the analysis of appellant's arguments will be included below.

¶ 36 ANALYSIS

¶ 37 Appellant argues that the trial court improperly granted summary judgment in favor of the appellees. The court granted summary judgment on claims of defamation and intentional interference with continued employment. We review a grant of summary judgment *de novo*. *Forsythe v. Clark USA, Inc.*, 224 Ill. 2d 274, 280 (2007). "Section 2-1005 of the Code of Civil Procedure provides for summary judgment when the pleadings, depositions, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact ***." *Id.*; 735 ILCS 5/2-1005 (West 2008). We review the record in the light most favorable to the nonmoving party. *Forsythe*, 224 Ill. 2d at 280. "We may affirm on any basis appearing in the record, whether or not the trial court relied on that basis or its reasoning was correct." *Atanus v. American Airlines, Inc.*, 403 Ill. App. 3d 549, 554 (2010).

¶ 38 I. Defamation

¶ 39 Appellant argues that the trial court improperly granted summary judgment to DeVault and Olson with respect to his claims of defamation *per se*. "To prove defamation, a plaintiff must show that the defendant made a false statement about him, that there was an unprivileged publication to a third party with fault by the defendant, and that the publication damaged plaintiff." *Vickers v. Abbott Laboratories*, 308 Ill. App. 3d 393, 400 (1999). "Truth is an absolute defense to defamation; true statements cannot support a claim of defamation." *Hnilica v. Rizza Chevrolet, Inc.*, 384 Ill. App. 3d 94, 97 (2008). Damages are presumed in a claim of *per se* defamation. *Bryson v. News America Publications, Inc.*, 174 Ill. 2d 77, 87 (1996). "In Illinois, there are five categories of statements that are considered defamatory *per se*: (1) words that impute a person has committed a crime; (2) words that impute a person is infected with a loathsome communicable disease; (3) words that impute a person is unable to perform or lacks integrity in performing her or his employment duties; (4) words that impute a person lacks ability or otherwise prejudices that person in her or his profession; and (5) words that impute a person has engaged in adultery or fornication." *Solaia Technology, LLC v. Specialty Publishing Co.*, 221 Ill. 2d 558, 579-80 (2006). "It is well settled that, even if an alleged statement falls into one of the categories of words that are defamatory *per se*, it will not be actionable *per se* if it is reasonably capable of an innocent construction." *Green v. Rogers*, 234 Ill. 2d 478, 499 (2009). Appellant attempts to establish DeVault made a defamatory statement with the following from DeVault's deposition:

"Q. What did you say to Jim Olson?

A. Essentially, conveyed the message that what Shawn had told me, that we had–the allegations that Andre had assaulted his daughter and that he thought there was a warrant out for Andre's arrest, and that we would need to contact Andre and work through the issue, and that's paraphrasing, for sure, because I don't remember the exact conversation.

Q. Did you tell Jim Olson that Mr. Maddox had said that the alleged assault was reported to local law enforcement and that Harrison had a warrant for his arrest?

* * *

A. Yes, I did."

He also points to this testimony from the deposition of Olson:

"Q. What did Mr. DeVault tell you?

A. He said that Shawn told him that there was some incident, assault, of his daughter on Friday night or Saturday morning before.

Q. What else did he say?

A. That it had been reported to the police.

Q. Did DeVault say that he reported it to the police, or did DeVault say that Maddox had reported it, said it was reported to the police?

A. That Maddox said that it was reported to the police.

Q. Did he say that there was an arrest warrant out for Andre?

A. That came up. I don't know if he said there is a warrant or there may be a warrant. I don't know. This is what Shawn Maddox said.

Q. So Maddox said either there may be a warrant or there was a warrant?

A. He said one of those."

¶ 40      Olson and DeVault argue that these statements cannot support a claim for defamation because they are true. Appellant has never claimed that Shawn Maddox did not make the allegations concerning appellant. The evidence does not establish that DeVault made a defamatory statement. DeVault merely made the truthful statement regarding what Shawn Maddox had alleged. Appellant failed to establish DeVault made a defamatory statement.

¶ 41      The evidence presented with regard to the alleged defamatory statements made by Olson include the deposition of Martin. Counsel questioned her concerning a note she wrote that said, "He turned himself in?":

"Q. What's it mean, 'He turned himself in.'?

A. Well, there is a question mark there.

Q. I know, but who told you that he turned himself in?

A. I don't recall for sure, but I believe it was–

* * *

Q. With whom were you communicating to get this information?

A. I talked to a number of people that day. This particular one, I believe that perhaps Jim Olson may have said something like that.

Q. Said that Andre turned himself into the police?

A. Something like that.

Q. Okay. That was perhaps mere paraphrasing?

A. Yes."

Olson's deposition testimony indicates that he informed Brockway "that an employee had made this accusation."

¶ 42    In Digney's deposition, he was asked about various statements in his report. Specifically, referring to the report:

"Q. Look at page 4 and the top of page five. It says, 'It should be noted that Maddox informed DeVault that the alleged assault was reported to local law enforcement and that Harrison had a warrant for his arrest.'

A. Mr. Olson must have told me that, then."

¶ 43    Appellant seems to argue that the phrase "and that Harrison had a warrant for his arrest" is somehow not related to the rest of the sentence, which makes clear that these are things that Maddox told DeVault. This evidence merely shows that Olson passed along the allegations that Maddox made. Appellant has failed to establish that Olson made a defamatory statement. The trial court's grant of summary judgment on behalf of Olson and DeVault is affirmed.

¶ 44                              II. Intentional Interference

¶ 45    In separate counts, appellant alleges that each of the appellees interfered with his ongoing employment at Seeding. The appellees raise two arguments supporting the trial court's grant of summary judgment on the intentional interference claims. First, they argue that appellant's intentional interference claims are preempted by the Illinois Human Rights Act (the Human Rights Act) (775 ILCS 5/1-101 *et seq.* (West 2008)). Second, they argue that even if the action is not preempted by the Human Rights Act, their actions were privileged.

¶ 46                              A. The Human Rights Act Preemption

¶ 47    Defendants rely on *Geise v. Phoenix Co. of Chicago, Inc.*, 159 Ill. 2d 507 (1994), for the proposition that appellant's intentional interference claims are preempted by the Human Rights Act. They argue that appellant asserts that all of the defendants decided to interfere with his continued employment in retaliation for his previous claims of discrimination, which is covered by the Human Rights Act.

¶ 48    The Illinois Supreme Court recently clarified *Geise* in *Blount v. Stroud*, 232 Ill. 2d 302 (2009). The Human Rights Act preempts tort claims only when they are "inextricably linked" to a civil rights violation. *Blount*, 232 Ill. 2d at 313. No preemption exists if there is an independent basis for the action apart from the Human Rights Act. *Id.*

¶ 49    Since appellant's allegations of intentional interference are cognizable without reference to the legal duties created by the Human Rights Act, they are not preempted by the Human Rights Act.

¶ 50                              B. Intentional Interference

¶ 51    We note that appellant appears to be arguing that all of the defendants conspired to

interfere with his employment; he claims that the actions of all the defendants should be looked at together to determine whether they tortiously interfered with his continued employment. Yet, he did not allege a conspiracy in his complaint. He also did not name Deere as a defendant, which would have been liable for all of the actions taken by its employees. Our function is to ensure that the trial court correctly determined that no issues of material fact remain. *Forsythe*, 224 Ill. 2d at 280. We will address each count individually to determine whether questions of fact remain with regard to that count.

¶ 52    In order to prevail on a claim of intentional interference with prospective economic advantage, appellant must show: (1) that he had a reasonable expectation of continued employment; (2) that the defendants knew of the expectancy; (3) that their intentional and unjustified interference caused the termination of the employment; and (4) damages. *Anderson v. Vanden Dorpel*, 172 Ill. 2d 399, 406-07 (1996); *Fellhauer v. City of Geneva*, 142 Ill. 2d 495, 511 (1991); *Vickers v. Abbott Laboratories*, 308 Ill. App. 3d 393, 411-12 (1999). Generally, a corporate officer cannot interfere with the continued employment of an employee of the corporation because the officer acts on behalf of the corporation. *Vickers v. Abbott Laboratories*, 308 Ill. App. 3d 393, 411 (1999). "This qualified privilege does not apply where officers act solely for their own gain or solely for the purpose of harming plaintiff since such conduct is not undertaken to further the corporation's interest. [Citation.] To be tortious, a corporate officer's action must be done without justification or maliciously." (Emphasis omitted.) *Mittelman v. Witous*, 135 Ill. 2d 220, 249 (1989), *abrogated by Kuwik v. Starmark Star Marketing & Administration, Inc.*, 156 Ill. 2d 16 (1993).

¶ 53                    Counts VII and VIII–Interference by Olson and DeVault

¶ 54    Appellant made identical claims against Olson and DeVault. He claims they illegally scrutinized his e-mail and text messages, banned appellant from work, and falsely claimed that he created a financial risk as well as a risk of workplace violence.

¶ 55    None of this is supported by the record. Shawn Maddox informed DeVault of the accusations concerning Alissa Maddox and Thielbert. DeVault, who was out of the country, contacted Olson. After talking to Black, Olson recommended that the employees be separated until an investigation could be completed. Olson and DeVault agreed that as a management employee appellant would be able to work from home. They agreed to have appellant work from home and to inform security, so that they could conduct an investigation. DeVault and Olson had nothing further to do with the investigation or termination of appellant.

¶ 56    Appellant argues that Olson had a duty to investigate on his own, before informing Deere worldwide security of the allegations. Appellant presents no case law requiring that every person who learns of potential problems in the workplace must conduct his or her own investigation before informing those designated by the company to deal with such allegations. Olson and DeVault learned about the allegations of misconduct by appellant over the weekend. After taking initial steps to separate the employees involved in the accusation, they informed the people in the company responsible for investigating the allegations.

¶ 57    The argument that Olson and DeVault falsely claimed that appellant created a financial

risk as well as a risk of violence is baseless. Shawn Maddox had already threatened to attack appellant based on appellant's alleged conduct with Maddox's daughter, all of which is undisputed. Appellant also admitted to sleeping with a subordinate and having, at least, inappropriate relationships with other subordinates' wives. And, given the content of the text messages and appellants admissions, DeVault and Olson could reasonably have believed those relationships to be sexual. Certainly, this creates a financial risk to Deere.

¶ 58    There is no evidence that Olson and DeVault acted solely for their own gain or to harm appellant. Their prompt response to the allegations is exactly the type of response warranted by such allegations. The trial court's decision to grant summary judgment with respect to counts VII and VIII is affirmed.

¶ 59                                Count VI–Addington

¶ 60    Appellant alleged in his complaint that Addington was biased against him based on a charge of race discrimination appellant made in 2003, which Addington was unable to resolve. Appellant further alleged that Addington illegally scrutinized his e-mail and text messages, falsely claimed that appellant violated Deere's electronic equipment use policy, created a financial risk for the company, and created a risk of workplace violence.

¶ 61    Appellant offers no evidence, other than his own speculation, to substantiate that Addington sought retribution. "However, '[m]ere speculation, conjecture, or guess is insufficient to withstand summary judgment.' [Citation.]" *Atanus*, 403 Ill. App. 3d at 553. The mere fact that appellant made a claim of discrimination six years earlier does not raise a question of fact concerning Addington's actions. See *Clark County School District v. Breeden*, 532 U.S. 268, 273-74 (2001) (*per curiam*) (holding that adverse action occurring nearly two years after discrimination complaint showed "no causality at all"); *Hughes v. Derwinski*, 967 F.2d 1168, 1174-75 (7th Cir. 1992) (four-month gap between complaint and adverse action could not support a reasonable inference of retaliation).

¶ 62    In appellant's deposition, he stated that he was not aware of anything that indicated Addington had directed Digney to perform an improper investigation. In fact, there is no evidence that Addington had any control over how Digney performed his investigation. Ultimately, Addington made an oral report of Digney's investigation to Everitt, who made the decision to terminate appellant.

¶ 63    Addington informed Everitt of the results of Digney's investigation. Addington's deposition testimony is, "I told him that we substantiated an inappropriate relationship between Andre and a Volt employee; that in the course of that we identified two other–I used the words inappropriate relationships with Deere or Deere-related individuals, and that he had–that he had utilized company assets to create, nurture and continue those relationships." Appellant asserts that Addington was out to get him because he told Everitt that appellant violated the electronic usage policy. Yet, when asked in his deposition if he was aware of any violation of the electronic usage policy with respect to Bald, Addington replied, "No." This testimony does not preclude the fact that he felt the electronic usage policy had been violated by appellant with respect to Thielbert or Soliz.

¶ 64    Addington summarized the results of Digney's investigation to Everitt, who, after

receiving additional information from Martin, decided to terminate appellant. There is no evidence that Addington acted other than in the best interest of Deere. Appellant has failed to establish that Addington acted solely to harm appellant or for his own benefit. The trial court's grant of summary judgement with respect to count VI is affirmed.

¶ 65                                    Count IX–Interference by Martin

¶ 66        In count IX, appellant alleged Martin illegally participated in an investigation of appellant's personal life, permitted access to appellant's personal e-mail, and permitted the use of e-mails that did not occur during working hours and did not affect his work performance as the basis of appellant's termination. He further alleges that Martin disabled appellant's security badge and told security personnel not to allow him on the premises. His final allegation in this count is that Martin recommended appellant be fired even though she knew that other similarly situated employees had not been disciplined or terminated.

¶ 67        Appellant has presented no case law and made no argument supporting his claim that the decision to prevent him from returning to work until the investigation had been concluded was improper in any way. The record indicates that the decision was made that he could work at home while the investigation was ongoing. We believe the decision to ensure the people involved in this situation were kept separate during the course of the investigation was prudent and in no way supports a claim of intentional interference by Martin.

¶ 68        Appellant's allegation that Martin authorized a review of his "personal" e-mail is disingenuous. The record indicates only that Martin authorized Digney to review appellant's work e-mail, not a personal e-mail account. Appellant presented no argument in his opening brief concerning the illegality of Deere employees reviewing his work e-mail. The issue was raised for the first time in his reply brief when he cited to section 9 of the Illinois Personnel Record Review Act. 820 ILCS 40/9 (West 2010). Supreme Court Rule 341(h)(7) (eff. July 1, 2008) states that "[p]oints not argued are waived and shall not be raised in the reply brief." "This rule has been enforced by the reviewing courts of our State." *In re Estate of Jacobs*, 189 Ill. App. 3d 625, 628 (1989). This issue is not properly before the court, and we do not review it.

¶ 69        Martin informed Everitt that other Deere managers had been fired for conduct similar to that of appellant. She provided a specific example of a manager who had been fired in 2008 after engaging in a single, consensual sexual encounter with a Deere administrative assistant. She then recommended that appellant be terminated to remain consistent with recent Deere decisions concerning other managers. Appellant makes no argument or factual showing indicating these statements by Martin were not truthful. Nor does appellant provide evidence that establishes Martin was aware of similarly situated employees who were not terminated for similar activity since the company's practice evolved to one of zero tolerance. The trial court's grant of summary judgment with regard to count IX is affirmed.

¶ 70                              Counts X, XI and XII–Chisholm, Brockway and Digney

¶ 71        Appellant alleges in counts X, XI and XII that Chisholm, Brockway and Digney, after learning that the allegations that appellant assaulted Alissa Maddox were not true, illegally

-11-

directed that the investigation shift to appellant's personal life, and then, based on that illegal investigation recommended appellant be terminated. The record does not support any of these allegations. First, the investigation never delved into the potential criminal accusations made by Alissa Maddox. The record indicates that Chisholm, Brockway and Digney took care not to interfere with a potential criminal investigation.

¶ 72    Appellant argues that this must not be true due to the fact the allegations of assault are found in the investigative report. The report does contain references to the complaint that instigated the investigation; however, it does not include any investigation of the alleged assault. In fact, the report shows that as some witnesses started to talk about that issue, Digney steered the conversation away from the topic of the assault.

¶ 73    The initial allegations made by Alissa Maddox were twofold: first, she said that she had been assaulted by appellant; second, she claimed that Thielbert was being coerced into a sexual relationship with appellant due to his position of authority at Deere. The focus of the investigation was always on determining if any improper relationships existed at Deere and the potential for workplace violence and harassment claims. To the extent appellant is claiming this investigation violates section 9 of the Illinois Personnel Record Review Act, he waived this argument by failing to argue it in his opening brief. Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008); *In re Estate of Jacobs*, 189 Ill. App. 3d 625, 628 (1989).

¶ 74    Appellant argues that the investigation should have ended once Thielbert said that she was not being coerced into a sexual relationship. He cites no authority for the proposition that a company's investigation of an employee cannot go beyond the initial allegations. In this case, Digney's review of the messages appellant received on his work phone indicated that he had received inappropriate messages from an unknown number and had then forwarded them to his personal account. Once the company was aware of appellant's involvement in this other potentially inappropriate employee-related relationship, additional investigation was appropriate.

¶ 75    Neither Chisholm, Brockway nor Digney made any recommendations regarding what should be done with respect to appellant. They merely investigated allegations made against appellant. That the investigation ultimately concluded that appellant had acted inappropriately, albeit not in the way initially alleged, does not indicate in any way that they were not acting on behalf of the company. Chisholm, Brockway and Digney were simply doing what they were hired to do.

¶ 76    There are no facts that indicate Chisholm, Brockway or Digney failed to act in the best interest of the company. The trial court's grant of summary judgment with regard to counts X, XI and XII is affirmed.

¶ 77                                  Count XIII–Hornbuckle

¶ 78    In count XIII, appellant alleges that Hornbuckle intentionally interfered with appellant's employment by deciding to fire him for creating risks of work place violence and financial liability for Deere, as well as for violating the electronic equipment policy, even though Hornbuckle had reason to know that similarly situated employees had engaged in similar acts and not been terminated or disciplined.

¶ 79 Appellant argues that Hornbuckle acted out of a desire for retribution against him for a claim of racial discrimination made in 2003. Again, he offers no facts other than his belief that Hornbuckle acted out of a desire for revenge. He has failed to present an issue of material fact concerning his claim of retaliation. See *supra* ¶ 65-69.

¶ 80 The evidence of Hornbuckle's involvement is exceptionally minimal. He was part of the conference call in which Everitt decided to terminate appellant. However, there is no record that he made any recommendations regarding termination or that he had any part in the investigation. Appellant makes much of the fact that Hornbuckle later admitted that he had had an improper relationship with a subordinate. His argument is that since Hornbuckle was not terminated, obviously, terminating appellant for an inappropriate relationship was a sham. The problem with this theory is that there is no evidence that Hornbuckle terminated appellant. If Hornbuckle did something wrong and was not terminated, this hardly gives rise to a cause of action against Hornbuckle. What would the tort be called, "Failure to get fired"? Also, appellant does not deny that he has had not just one, but several inappropriate relationships with employees and wives of employees. It was not unreasonable for Deere to conclude that such conduct was unacceptable.

¶ 81 Appellant has failed to come forth with any evidence that Hornbuckle did anything to affect appellant's employment status, let alone evidence that he did something for an improper reason. The trial court's grant of summary judgment with regard to count XIII is affirmed.

¶ 82 CONCLUSION

¶ 83 The record clearly establishes that appellant's conduct in having relationships not only with subordinates, but also with wives and a daughter of employees created a risk of workplace violence as well as a risk of financial liability for Deere. We find this appeal to be totally devoid of merit.

¶ 84 For the foregoing reasons, the judgment of the circuit court of Rock Island County is affirmed.

¶ 85 Affirmed.