2023 IL App (3d) 220324

Opinion filed October 13, 2023

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2023

| KIM GRAKO, | ) | Appeal from the Circuit Court |
|---|---|---|
| | ) | of the Thirteenth Judicial Circuit, |
| Plaintiff-Appellant, | ) | La Salle County, Illinois, |
| | ) | |
| v. | ) | Appeal No. 3-22-0324 |
| | ) | Circuit No. 19-L-74 |
| | ) | |
| BILL WALSH CHEVROLET-CADILLAC, | ) | Honorable |
| INC., d/b/a Bill Walsh Automotive | ) | Troy D. Holland, |
| Group; WILLIAM K. WALSH; and | ) | Judge, Presiding. |
| KEVIN SCHULTZ, | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |
| (Bill Walsh Chevrolet-Cadillac, Inc. d/b/a Bill | ) | |
| Walsh Automotive Group, and William K. | ) | |
| Walsh, Defendants-Appellees). | ) | |
| | ) | |

_____

JUSTICE ALBRECHT delivered the judgment of the court, with opinion.
Justices Peterson and Davenport concurred in the judgment and opinion.

_____

**OPINION**

¶ 1        Plaintiff, Kim Grako, filed a two-count amended complaint seeking relief against

defendants, William K. Walsh and Bill Walsh Chevrolet-Cadillac, Inc., for tortious interference

with prospective economic advantage. Plaintiff alleged that Walsh leveraged his status as a client

of her former employer to secure her termination. Following deposition practice, the circuit court

granted defendants' motion for summary judgment pursuant to section 2-1005(c) of the Code of Civil Procedure (Code). 735 ILCS 5/2-1005(c) (West 2022). For the reasons that follow, we reverse and remand the cause for further proceedings.

¶ 2                                    I. BACKGROUND

¶ 3        As tortious interference claims require, this matter involves no fewer than three relevant actors. Grako alleges that she was fired from her former employer, Ramza Insurance Group, Inc. (Ramza Insurance), due to the purported interference of Walsh, a client of Ramza Insurance.

¶ 4        Grako began working at Ramza Insurance on October 25, 2016. Ramza Insurance is a full-service insurer, primarily offering policies to public entity businesses, including public schools, with offices located in Streator and Ottawa, Illinois. Several individuals worked in Ramza Insurance's Ottawa office during the time span pertinent to this lawsuit, including Christine Allen, a secretary; Kevin Schultz, an independent contractor; and Craig Ramza Jr., president of the company. Linda Hays, vice president of Ramza Insurance, and Grako worked at one of Ramza Insurance's Streator offices.

¶ 5        Based on the pleadings and depositions within the record, Grako filed for bankruptcy protection pursuant to federal law under Chapter 13 in November 2017. In June 2018, Grako returned a vehicle purchased from Bill Walsh Chevrolet-Cadillac, Inc., and discharged the associated debt.

¶ 6        The record reveals that Walsh had several personal insurance policies with Ramza Insurance. It also indicates that Bill Walsh-Chevrolet-Cadillac, Inc., bore the financial brunt of Grako's bankruptcy discharge of her vehicle. Walsh, an agent of Bill Walsh-Chevrolet-Cadillac, Inc., learned of the discharge in early November 2018. To Walsh's displeasure, the process of repossessing Grako's vehicle was at his expense. On November 7, he texted Grako, "R u kidding

me after all I've done for you?" After exchanging texts the following day on the financial burden to retrieve the vehicle, Walsh concluded his conversation with Grako by stating: "We are pulling all of our business from ramza tomorrow."

¶ 7 Around this time, Walsh communicated his discontentment with Grako to his friend Schultz. Schultz chronicled their conversation in a string of text messages to Allen, serving as an intermediary messenger between the displeased Ramza Insurance client and Ramza Insurance employees. According to Schultz, Walsh asked whether Grako worked at Ramza Insurance. Schultz's message also included the following:

> "We have MAJOR [expletive] problems!!! MAJOR!! Walsh is going to pull ALL their business is [*sic*] [Grako] works for us. She stuffed them For over $15,000!!!! [Walsh] has been texting me all night and I just replied ***. He is like MAJOR LEAGUE p*** ***. This is NOT NOT NOT good."

¶ 8 Allen later forwarded these messages to Hays, who was Grako's supervisor. Allen and Hays engaged in their own text conversation on the topic. Allen explained that Walsh was extremely unhappy with Grako and did "not want to be supporting where she works." Hays replied, "I'm sure [Schultz] will be all over Craig [Ramza Jr.] with that in the morning, unless he's already texting him." Allen also provided the financial implications of what Walsh's departure would cause for the company, recounting the policies that he had with Ramza Insurance at that time.

¶ 9 After taking a day off to recuperate from a medical procedure, Grako reached out to Hays via text on Friday, November 9, 2018, to confide in her that she was a "nervous wreck" and to ask Hays whether she had spoken to Ramza Jr. or Allen. Hays responded that she could not speak with Grako at that time. Grako messaged Hays that evening, explaining that she could not

3

access her personal Ramza Insurance account. She sent another message the following morning, asking whether she would be fired. Hays responded that they would have a discussion the following Monday. Per Hays, the decision to terminate Grako was still up in the air at this point.

¶ 10 Grako continued to message Hays requesting clarity on her job status. Frustrated that Grako was dictating the time and manner in which she and Hays would meet, Hays met with Grako at 9:00 a.m. on Saturday November 10, 2018, and terminated her employment at Ramza Insurance "based on her own attitude, [and] her own way of speaking to me." According to Hays, her termination had "nothing to do with" the Walsh incident.

¶ 11 In May 2019, Grako filed a single-count complaint against defendants, alleging tortious interference. In November 2019, defendants moved to dismiss pursuant to section 2-615 of the Code (735 ILCS 5/2-615 (West 2018)), arguing in part that Grako failed to plead factual allegations sufficient to support her tortious interference claim. The court granted defendants' motion without prejudice in December 2019. Grako then filed her first amended complaint on January 9, 2020, alleging Walsh tortiously interfered with her employment relationship, resulting in her termination. According to the pleading, Grako was informed that the reason for her termination was that she "p*** off a major client" and that the client had requested the same. She also alleged that in pursuance of her termination, Walsh acted as an agent of Bill Walsh Chevrolet-Cadillac, Inc.

¶ 12 Defendants filed a motion for summary judgment and requested Illinois Supreme Court Rule 137 (eff. Jan. 1, 2018) sanctions on December 22, 2021, relying upon the deposition testimonies of Hays, Schultz, and Ramza Jr.

¶ 13 Hays testified that, in her role as vice president, she had hiring and firing authority of Ramza Insurance employees. She had pursued Grako for employment based off of prior

4

pleasurable interactions. Hays testified that she fired Grako based on her past employment history with Ramza Insurance and that it had nothing to do with the Walsh incident. Hays averred that Grako was at times disrespectful, pushy, and caused Hays stress. According to Hays, she had no plans to meet with Grako prior to the Walsh incident.

¶ 14　　Schultz testified that, as an independent contractor for Ramza Insurance, he shares fifty percent of new property and casualty insurance commissions with the company. Ramza Insurance established a business agreement with Schultz around 2011. Based on Schultz's estimation, the company's share of commissions from his work exceeds $50,000 annually. Schultz described Walsh as a lifelong friend, someone who he has always called "Billy." Walsh was also one of Schultz's clients. Although Schultz had no recollection of the specific conversation giving rise to the text exchange with Allen, he recalled that Walsh told Schultz if Grako was employed with Ramza Insurance "we've got an issue[.]" In addition to his text conversation, Schultz spoke to Hays regarding the incident.[1] According to Schultz, Walsh never requested that he terminate Grako's employment. Similarly, he never requested Grako's discharge nor was he in a position to do so. The proposition that Grako would be terminated from Walsh threatening to pull his insignificant amount of business from Ramza Insurance is "ludicrous." When asked why he acted impetuously in his texts to Allen, Schultz explained that he did not want to lose a friend's business or anybody's business.

¶ 15　　Craig Ramza Jr. testified that Walsh was a client of Ramza Insurance in November 2018. Walsh had anywhere from one to three personal insurance policies with Ramza Insurance. In the aftermath of the Walsh incident, Ramza Jr. testified that Walsh frequently called the Ramza

---

[1]Hays testified that she had no recollection of speaking with Schultz.

Insurance offices, looking to speak with Grako. Ramza employees would inform him that she was not available. Walsh's pattern of persistently calling the offices "put pressure on the rest of the agency." Ramza Jr. minimized the importance of Walsh as a personal client, describing him as a needle in the haystack and further providing that "I would never fire one of my employees simply based off a complaint from a customer." Ramza Jr. described situations where Grako was in a "certain mood" and would have profanity-laden correspondences with clients and Ramza Insurance agents alike. As he summarized, Grako "was a good employee when she wanted to be, but just some of her actions and her reactions were not good representation" for Ramza Insurance.

¶ 16     After briefing, the court heard arguments on defendants' motion on June 8, 2022, and took the matter under advisement. The circuit court issued a written order on July 19, 2022, granting defendants' motion for summary judgment but denying their request for Rule 137 sanctions. The court found that there was no direct evidence that Walsh requested Grako's termination from Ramza Insurance. There was also no direct evidence that Walsh was a "major client," as Grako alleged in her complaint. Finally, there was no evidence whatsoever that Walsh provided false information to Ramza Insurance agents.

¶ 17     Grako timely appealed.

¶ 18                                   II. ANALYSIS

¶ 19     On appeal, defendants argue that the circuit court was correct in finding there was insufficient evidence within the record to conclude that Walsh intentionally interfered with Grako's employment as is required by the third element of her tortious interference action. The court's order also cast doubt on whether Grako's at-will status affords her a reasonable expectation of continued employment as is necessary to satisfy the first element. We disagree

6

and find that the court erred in its ruling by failing to apply all reasonable inferences in Grako's favor and by misapplying tortious interference law.

¶ 20    Summary judgment should be granted only where the pleadings, depositions, admissions, and affidavits on file, when viewed in the light most favorable to the nonmoving party, show that there is no genuine issue as to any material fact and that the moving party is clearly entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2022). Disposing a case through summary judgment is a drastic measure. *Hanley v. City of Chicago*, 343 Ill. App. 3d 49, 53 (2003). We review a circuit court's entry of summary judgment *de novo*. *Pielet v. Pielet*, 2012 IL 112064, ¶ 30.

¶ 21    Illinois recognizes two similar but distinct torts of tortious interference in the employment context: tortious interference with a contract and tortious interference without a contractual relationship. See *Belden Corp. v. InterNorth, Inc.*, 90 Ill. App. 3d 547, 551 (1980). Their elements are similar, but not identical. *Id.* at 552. The central difference between the two is the greater degree of protection afforded to parties with contractual relations. *Id.* at 551. A contractual relation is "sacrosanct" and "takes precedence over the conflicting rights of any presumptive interferor, including his [or her] right to compete and his [or her] own prospective advantage." *Id.* (citing William L. Prosser, Handbook of the Law of Torts § 129, at 945 (4th ed. 1971)). The impetus behind these causes of action, however, remains much the same: sanctioning the meddling in another's business affairs.

¶ 22    Unlike employees with formal contractual arrangements, at-will employees possess an actionable interest in their "future relations between" employee and employer. Restatement (Second) of Torts § 766, cmt. g (1979). The tort recognizes that a person's business relationships constitute a property interest and, as such, are entitled to protection from unjustified tampering

7

by another. *Chicago's Pizza, Inc. v. Chicago's Pizza Franchise Ltd. USA*, 384 Ill. App. 3d 849, 862 (2008). Therefore, while parties to a formal contractual business relationship are afforded a greater degree of protection from another's interference, one's business expectancy under an at-will arrangement nonetheless confers legal protection until said agreement is terminated. See *Miller v. Lockport Realty Group, Inc.*, 377 Ill. App. 3d 369, 373-74 (2007); *Soderlund Brothers, Inc. v. Carrier Corp.*, 278 Ill. App. 3d 606, 615-16 (1995) (discussing heightened protection afforded to parties with contractual relationships); Restatement (Second) of Torts § 766 (1979). The tortious interference subset without a contractual relationship requires plaintiff to put forth similar evidence to establish a *prima facie* case. See *Ricco v. Southwest Surgery Center, LLC*, 73 F. Supp. 3d 961, 973 (N.D. Ill. 2014) (noting the evidentiary requirements for a claim of tortious interference with employment expectancy mirrors those for a tortious interference with business expectancy or economic advantage claim).

¶ 23        Considering Grako's prospective interest as an at-will employee,[2] her cause of action lies under tortious interference with prospective economic advantage,[3] the elements of which are well established:

> " 'To state a cause of action for intentional interference with prospective economic advantage, a plaintiff must allege (1) a reasonable expectancy of entering into a valid business relationship, (2) the defendant's knowledge of the

---

[2]An at-will employee's hope for his or her employment relationship to continue confers "no legal right but only an expectancy" that is actionable. Restatement (Second) of Torts § 768, cmt. i (1979).

[3]Illinois courts use various titles to describe the same tort, including tortious interference with a prospective economic advantage, tortious interference with prospective business relationships, and tortious interference with prospective expectancies. See *Delphi Industries, Inc. v. Stroh Brewery Co.*, 945 F.2d 215, 217 n.1 (7th Cir. 1991). The Restatement (Second) of Torts offers the label of intentional interference with prospective contractual relation. Restatement (Second) of Torts § 766B (1979). For coherence and ease of discussion, we refer to this tort as tortious interference with prospective economic advantage within this opinion.

expectancy, (3) an intentional and unjustified interference by the defendant that induced or caused a breach or termination of the expectancy, and (4) damage to the plaintiff resulting from the defendant's interference.' " *Voyles v. Sandia Mortgage Corp.*, 196 Ill. 2d 288, 300-01 (2001) (quoting *Anderson v. Vanden Dorpel*, 172 Ill. 2d 399, 406-07 (1996)).

See *Storm & Associates, Ltd. v. Cuculich*, 298 Ill. App. 3d 1040, 1052 (1998) (an employee's action for tortious interference with a contract terminable at will "is classified as one for intentional interference with prospective economic advantage").

¶ 24                          A. Existence of a Valid Business Relationship or Expectancy

¶ 25         To satisfy the first element of tortious interference with prospective economic advantage, the record must reveal supportive evidence that Grako had a reasonable expectation of continued employment. Our analysis begins with the circuit court's note of uncertainty surrounding whether an at-will employee may bring a tortious interference with employment claim in Illinois and whether the employee's at-will status negates an expectation of continued employment. According to the court's order, the issue of whether an at-will employee can sustain a tortious interference claim remains unsettled. To support this assertion, the court cites our supreme court's decision in *Fellhauer v. City of Geneva*, 142 Ill. 2d 495, 511 (1991), and the Seventh Circuit's decision in *Webb v. Frawley*, 906 F.3d 569, 580-81 (7th Cir. 2018). We find those opinions inapposite.

¶ 26         Our supreme court in *Fellhauer* merely addressed a division among appellate districts on whether an at-will employee may make a claim for tortious interference with contractual relations. 142 Ill. 2d at 510. *Fellhauer* did not resolve this division, as noted in *Webb*, because the supreme court did not challenge the appellate court's determination that the at-will plaintiff's

9

claim sounded in intentional interference with prospective economic advantage. *Id.* at 510-12; *Webb*, 906 F.3d at 580-81.

¶ 27 We find no need to opine on the issue, as it is not properly before this court. The parties agree, as evidenced through the pleadings, that the rubric upon which Grako brings the instant action is a claim for intentional interference *without* a contractual relationship. Indeed, the circuit court's order granting summary judgment identifies Grako's cause of action not as one for interference with contractual relations, but one for intentional interference with an employment relationship.

¶ 28 Collectively, *Fellhauer*, caselaw preceding that decision, and its progeny, make it clear that an at-will employee may bring a tortious interference with prospective economic advantage action. Within the ambit of tortious interference law, as varied as it may be, our sister districts have uniformly upheld this tenet. See *Dowd & Dowd, Ltd. v. Gleason*, 352 Ill. App. 3d 365, 381 (2004) (finding a law firm's at-will contract with institutional client created a relationship sufficient to support an action for tortious interference); *La Rocco v. Bakwin*, 108 Ill. App. 3d 723, 731 (1982) (placing less import on the nature of the agreement and more on the alleged interference to find that intrusion into an attorney's relationship with his client supported tortious interference with business relationship despite terminable at will relationship); *Olaf v. Christie Clinic Ass'n*, 200 Ill. App. 3d 191, 195 (1990) (explaining that a tortious interference claim without an enforceable contract, such as a physician-patient's terminable at will relationship, may be brought as a claim of tortious interference with prospective economic advantage); *Kemper v. Worcester*, 106 Ill. App. 3d 121, 125 (1982) (holding a bank president had a sufficient relationship with the bank, arising from the National Bank Act (12 U.S.C. § 38 (2018)), to

10

support an action for tortious interference with advantageous or contractual relations, despite the relationship being terminable at will).

¶ 29      On this subject, the Restatement of Torts remarks that "liability for inducing breach of contract is now regarded as but one instance, rather than the exclusive limit, of protection against improper interference in business relations." Restatement (Second) of Torts § 766, cmt. c (1979). A contract terminable at-will, for example, creates a valid and subsisting interest of continued employment to which a third-party may not improperly interfere. See Restatement (Second) of Torts § 766, cmt. g (1979); but see *Cashman v. Shinn*, 109 Ill. App. 3d 1112, 1118-19 (1982) (finding the presumption that an at-will employee's employment will continue is not absolute).

¶ 30      This court has long held the same, explaining that under this cause of action the relationship between parties is a secondary consideration to which an enforceable contract is not a prerequisite. Rather, our focus is on the interference of the relationship itself. *Lusher v. Becker Brothers, Inc.*, 155 Ill. App. 3d 866, 869-70 (1987) (citing *La Rocco*, 108 Ill. App. 3d at 731); see *City of Rock Falls v. Chicago Title & Trust Co.*, 13 Ill. App. 3d 359, 363 (1973) (noting the elements of a tortious interference with prospective economic advantage include "the existence of a valid business relationship (*not necessarily evidenced by an enforceable contract*)" (emphasis added)); see also *Dowd & Dowd, Ltd. v. Gleason*, 181 Ill. 2d 460, 484 (1998) ("The focus *** is not on the conduct of the client in terminating the relationship, but on the conduct of the party inducing the breach or interfering with the expectancy."). We will not disrupt what has already been decided and, accordingly, find that Grako's at-will status does not bar her tortious interference claim.

¶ 31      As for evidence bearing on Grako's expectation of continued employment, Ramza Jr. and Hays ascribed a certain brashness to Grako as the reason for her discharge. Hays testified that

11

Grako was fired based upon her performance and indicated a frustration that Grako attempted to dictate how they met to discuss the Walsh incident as another reason. All deponents downplayed the sway Walsh conceivably would have over the decision to fire Grako. Yet there is no indication within the record that Grako's discharge was imminent prior to the Walsh incident. Indeed, Hays testified that, prior to the incident, there was no scheduled meeting to discuss Grako's job performance and she did not plan to meet with Grako prior to the Walsh incident. As such, we find that the record supports a reasonable inference that Grako possessed a sufficient expectation of continued employment.

¶ 32                          B. Knowledge of Business Relationship or Expectancy

¶ 33        The parties do not dispute that Grako has advanced sufficient evidence to support the second element of her tortious interference claim. In his answer to the first amended complaint, Walsh conceded he was aware that Ramza Insurance was Grako's employer. The text messages exchanged between Schultz and Allen indicate that Walsh sought and procured this knowledge. *Cf. Harris v. Franklin-Williamson Human Services, Inc.*, 97 F. Supp. 2d 892, 908 (S.D. Ill. 2000) (tortious interference claim failed where plaintiff failed to present evidence that defendants were aware of business relationship).

¶ 34                          C. Intentional and Unjustified Interference

¶ 35        Defendants argue that the circuit court correctly found Grako failed to establish the third element of her tortious interference claim, which requires a showing that Walsh's interference prevented the realization of her continued employment at Ramza Insurance. See *Chicago's Pizza, Inc.*, 384 Ill. App. 3d at 863. In granting summary judgment, the circuit court focused on the nature of the purported interference, finding Grako failed to produce any evidence that Walsh conveyed false information, did not show that Walsh was a "major client" of Ramza Insurance,

12

and did not provide direct evidence that Walsh requested her termination. Rather, it found that the only direct evidence indicated Grako's termination was for "other reasons unrelated to" Walsh.

¶ 36    To be found liable for tortious interference with prospective economic advantage, a defendant's interference must be intentional and improper. Restatement (Second) of Torts § 766B (1979); Restatement (Second) of Torts § 767, cmt. a (1979). It is insufficient for a plaintiff to show that the defendant merely succeeded by ending the business relationship or interfering with the expectancy; rather, "purposeful interference"—a showing that the defendant has committed some impropriety—is needed. See *Dowd & Dowd, Ltd.*, 181 Ill. 2d at 485. Section 767 of the Restatement lists several factors which courts consider in determining whether an alleged interferer's conduct reaches actionable impropriety, including (1) the nature of the interfering conduct, (2) the interferer's motive, and (3) the proximity or remoteness of the interferer's conduct to the interference. See Restatement (Second) of Torts § 767 (1979). Concerning an interferer's motive, it may become important to determine whether an interferer was motivated "by a desire to interfere with the other's" business expectancy. See Restatement (Second) of Torts § 767, cmt. d (1979). If that desire was the sole motive behind the interference, it is "almost certain" to qualify as improper interference. *Id.* As the Restatement makes plain, the "motive to injure another or to vent one's ill will on him [or her] serves no socially useful purpose." *Id.* While our supreme court has not formally adopted the Restatement, it continues to serve as helpful persuasive authority in tortious interference evaluation. See *Atanus v. American Airlines, Inc.*, 403 Ill. App. 3d 549, 554 (2010).

13

¶ 37                                        1. Falsity as a Prerequisite

¶ 38        In granting summary judgment, the circuit court relied upon a statement of law cited in

*Calabro v. Northern Trust Corp.*, 2017 IL App (1st) 163079-U, ¶ 18, an unpublished Rule 23

order from the First District, which states "Illinois courts in employment and other contexts have

consistently held that an intentional interference claim requires the provision of *false*

information." (Emphasis in original.) We believe this statement of tortious interference law was

painted with too broad a brush, the court erred in relying upon this nonprecedential order, and

falsity is not a prerequisite to Grako's tortious interference claim.

¶ 39        The Restatement provides that one cannot be found liable for "merely" providing

"truthful information to another." Restatement (Second) of Torts § 772, cmt. b (1979). That is,

much like its relationship to defamation actions, truthful statements serve as an absolute defense

if the purported interference involves the conveyance of information. See *id.* Here, the circuit

court awarded summary judgment in part based on plaintiff's failure to produce evidence that

defendant provided false information, relying on the *Calabro* decision and the cases cited within

*Calabro* that espouse this principle of law. A review of these cases reveal, however, that the

alleged interference at issue strictly involved the conveyance of information.

¶ 40        In *Calabro*, the plaintiff, a chief compliance officer for an investment corporation, was

terminated after his employer gained information from an anonymous source that he was

removed as a corporate executive of a trust during his prior employment, a fact he failed to

disclose during the interview process. *Calabro*, 2017 IL App (1st) 163079-U, ¶¶ 5-6. Plaintiff

filed a petition for pre-suit discovery pursuant to Illinois Supreme Court Rule 224 (eff. Jan. 1,

2018), claiming intentional interference and seeking to learn the identity of the source of this

information. *Calabro*, 2017 IL App (1st) 163079-U ¶¶ 2, 7. The circuit court dismissed

14

plaintiff's petition with prejudice, explaining a party is not liable for tortious interference "as a result of merely providing truthful information." *Id.* ¶ 9. The First District upheld the dismissal of plaintiff's petition on this ground. See *id.* ¶¶ 17-20.

¶ 41    In *Voyles*, our supreme court found that a homeowner failed to state a claim for tortious interference against a mortgage servicer after her credit report revealed delinquent payments to the servicer, which in part resulted in a mortgagee denying her application for a loan. 196 Ill. 2d at 293. The homeowner's tortious interference action was premised upon the servicer's reports containing allegedly false information. *Id.* at 294. Finding that the reports were indeed "accurate and proper," the court held the servicer did not unjustifiably interfere. *Id.* at 301.

¶ 42    The interference complained of in the other cases *Calabro* cites also involve the exchange of information singularly. See *Atanus*, 403 Ill. App. 3d at 555-56 (relying on *Voyles* in holding that the exchange of gate access records that contained truthful information could not support the employee's intentional interference claim); *Soderlund Brothers, Inc.*, 278 Ill. App. 3d at 622-23 (finding letter of competitor primarily contained opinion); see also *Delloma v. Consolidation Coal Co.*, 996 F.2d 168, 174 (7th Cir. 1993) (upholding summary judgment in favor of former employer where former employer's response to prospective employer's inquiry was truthful).

¶ 43    Based on the foregoing, a more accurate statement of tortious interference law is when the alleged interference is premised strictly upon the conveyance of information, a plaintiff must prove that such information is false in order to prevail. *Soderlund Brothers, Inc.*, 278 Ill. App. 3d at 620 ("There is no liability for interference with a prospective contractual relation on the part of one who *merely* gives truthful information to another." (Emphasis added.)); *Cf.* Restatement (Second) of Torts § 772, cmt. b (1979). Here, the alleged interference does not involve the mere

15

exchange of truthful information; rather, Grako alleges that Walsh, enraged by Grako's return of her vehicle and discharge of the loan, leveraged his personal ties and influence over Ramza Insurance to get her fired. The *Atanus* court drew this distinction when the plaintiff attempted to cite our supreme court's decision in *Dowd & Dowd, Ltd.*, 181 Ill. 2d at 471, to assert that proof of falsity is not a requirement of his claim. *Atanus*, 403 Ill. App. 3d at 555. The court clarified that unlike his claim, "the alleged interference in *Dowd & Dowd* had nothing to do with giving information; instead, the defendants in *Dowd & Dowd* were accused of soliciting a major client from their former law firm prior to their departure from the firm" as the means of their interference. *Id.*

¶ 44       Within her first amended complaint, Grako asserts that Walsh not only informed Ramza Insurance agents of her bankruptcy and the associated debt discharge, but also threatened to withdraw his business from Ramza Insurance and communicated his displeasure upstream to Grako's superiors. The text exchange between Allen and Hays confirms that Walsh was a Ramza Insurance client and did not want to "support[ ] where [Grako] works." Hays's testimony reveals the immateriality of the truthful information that Walsh conveyed on the decision to terminate Grako. According to Hays, Grako previously informed her of the bankruptcy, a fact she was made aware of "during the whole process." The truthful information that Walsh conveyed that was previously unknown to members of Ramza Insurance, therefore, was that Bill Walsh Chevrolet-Cadillac, Inc. was financially impacted from Grako's bankruptcy filing.

¶ 45       However, the primary interference alleged is the coercion Walsh purportedly exerted over Ramza Insurance in threatening to pull his business. This threat was corroborated by Walsh's texts to Grako and, separately, by Walsh's conversation with Schultz, memorialized in texts between Schultz and Allen. In that exchange, Schultz described Walsh's dissatisfaction as a

16

"MAJOR [expletive] Problem[ ]!!!" Allen forwarded that message to Hays, explaining "Walsh is going to pull ALL their business is [*sic*] [Grako] works for us." Therefore, the allegations within Grako's complaint involve interference distinct from "merely giv[ing] truthful information" concerning her bankruptcy and its effect on Bill Walsh Chevrolet-Cadillac, Inc.'s finances. Restatement (Second) of Torts § 772 (1979).

¶ 46                     2. Characterization of Defendant as a "Major Client"

¶ 47        We also find the circuit court placed too great a weight on Grako's inability to produce evidence that Walsh was one of Ramza Insurance's "major client[s]," as she alleged within her first amended complaint. What matters is that he was, in fact, a Ramza Insurance client. The descriptions in the deposition testimony of Ramza Jr., Hays, and Schultz of the extent that Walsh's threat impacted Grako's termination stands in stark contrast to the urgency Schultz conveyed in his text messages to Allen. We believe, whether Walsh was a major client or not, the determination of the extent of Walsh's influence over the decision to terminate Grako is an undetermined question of fact best reserved for the trier of fact.

¶ 48        Having found that the inducement is distinct from merely giving information, we believe the alleged inducement here aligns with what the Restatement classifies as inducing by refusal to deal. Restatement (Second) of Torts § 766B, cmt. e (1979); Restatement (Second) of Torts § 766, cmt. *l* (1979). This may occur where a third party induces the breach of an employment relationship by "threatening not to enter into, or to sever, business relations" with another. Restatement (Second) of Torts § 766, cmt. *l* (1979). Although an individual has no legal obligation, barring a contract, to do business with another, there remains a "general duty not to interfere intentionally with another's reasonable business expectancies of trade with third person, whether or not they are secured by contract" unless such interference is not improper.

17

Restatement (Second) of Torts § 766, cmt. b (1979). Thus, Walsh's animosity towards Grako would be a legitimate reason to refuse to give Ramza Insurance his continued business. See Restatement (Second) of Torts § 766, cmt. *l* (1979). However, tortious interference arises when the individual takes an additional step; in this context, when pressure—financial or otherwise—is exerted to affirmatively induce a breach of agreement. A question of material fact remains whether this additional step occurred here.

¶ 49      This is also not the exclusive means of interference supporting Grako's lawsuit. When read in the light most favorable to Grako, the record creates separate questions of material fact about whether Walsh leveraged his relationship with Schultz to secure Grako's termination and whether Ramza Insurance capitulated based on its financial interest in appeasing Schultz. Restatement (Second) of Torts § 766B, cmt. e (1979); Restatement (Second) of Torts § 766, cmt. k (1979) ("There is no technical requirement as to the kind of conduct that may result in interference" "it may be a simple request or persuasion exerting only moral pressure.").

¶ 50      Schultz described his relationship to Walsh as a lifelong friendship. Hays, who had firing authority and made the decision to terminate Grako, knew of this friendship and was aware of Schultz's barrage of seemingly urgent text messages. Schultz testified that his immoderate reaction was based on his friendship with Walsh. According to Schultz, he did not want to lose a friend's business. Walsh also told Schultz that Grako's employment at Ramza Insurance created "an issue." Beyond the exchange of text messages with Allen, Schultz spoke with Hays concerning the Walsh incident. Per his estimation, Ramza Insurance derives over $50,000 annually from his business. He also testified that neither he nor Walsh, through him, requested Grako's termination. Thus, a genuine issue of material fact remains whether Walsh's

18

interference, through his own conduct or through Schultz, impermissibly secured Grako's termination.

¶ 51                                    3. Causation

¶ 52        We similarly find error with the circuit court's causation ruling. The court granted summary judgment, in part, based on Grako's inability to produce direct evidence that Walsh asked Ramza Insurance to terminate her and, contrastingly, found that her termination resulted from Ramza Insurance's own reasons unrelated to Walsh.

¶ 53        The proximity of a third-party's conduct to the resultant interference is one factor courts weigh in determining whether the interference was improper. Restatement (Second) of Torts § 767, cmt. h (1979). Causation relates to the third element of intentional interference with prospective economic advantage, requiring the interference to "induce[ ] or cause[ ] a breach or termination of" plaintiff's reasonable business expectancy. *Anderson*, 172 Ill. 2d at 406. Therefore, included within our intentional and improper interference analysis, we must review whether the record supports a reasonable inference that Grako's termination would not have resulted but-for Walsh's actions and whether his actions bear a proximate relation to the adverse employment action. *Advantage Marketing Group, Inc. v. Keane*, 2019 IL App (1st) 181126, ¶¶ 44, 48 (finding an employer sufficiently alleged a former employee's breach proximately caused injury for its breach of fiduciary duty and tortious interference with prospective economic advantage claims to survive employee's motion to dismiss); compare *Haupt v. International Harvester Co.*, 582 F. Supp. 545, 550 (N.D. Ill. 1984) (an employer's cost-saving rationale for termination was insufficient to preclude the reasonable inference that supervisor's interference was the but-for cause of termination), with *Hess v. Kanoski & Associates*, 668 F.3d 446, 454 (7th

19

Cir. 2012) (failure to provide evidence that interferer's alleged disparaging comment to a client was heard by employer prevented a finding that the statement caused termination).

¶ 54		We disagree with the court's contention that the record reflects Grako's termination was an "independent decision and act[ ] of Ramza Insurance and its corporate officers" when Grako's supervisor testified that the meeting resulting in Grako's termination would not have occurred but for the Walsh incident. Schultz testified that Walsh conveyed "[i]f Kim Grako was there, we've got an issue." This fact alone supports that the interference was accomplished with the purpose of injuring Grako's employment. *Kapotas v. Better Government Ass'n*, 2015 IL App (1st) 140534, ¶ 80 (intentional interference claims require facts suggesting that the defendant acted with the purpose of injuring plaintiff's expectancies). It also indicates that Walsh used Grako's employer to vent his ill will and that his sole motivation was the desire to intermeddle with her business expectancy, which if proven, all but confirms that his interference was improper. See Restatement (Second) of Torts § 767, cmt. d (1979). Hays locked Grako out of Ramza Insurance's internal systems the day after learning about the Walsh incident. Grako's termination was solemnified the day following. The circumstantial timeframe of her firing raises an inference of impropriety and adds credence to a remaining question of material fact on the nexus between Walsh's displeasure and Grako's termination. See Restatement (Second) of Torts § 767, cmt. h (1979). As explained above, the degree of interference, if any, and the sphere of influence that Walsh possessed and exercised over Ramza Insurance remain material issues of fact.

¶ 55		D. Damages Resulting from Interference

¶ 56		Based on our analysis above, we find that when construing the record in the light most favorable to Grako, a genuine issue of material fact remains regarding whether Walsh's

20

purported interference resulted in her termination from Ramza Insurance, which, if proven, would satisfy the fourth and final element of her claim.

¶ 57 This decision should not be construed as an opinion from this court on the merits of Grako's tortious interference claim against Walsh and Bill Walsh Chevrolet-Cadillac, Inc. We do find, however, that the evidence before us presents numerous factual questions regarding Walsh's conduct and its possible impact over Grako's termination that precludes entry of summary judgment in defendants' favor.

¶ 58                                         III. CONCLUSION

¶ 59 The judgment of the circuit court of La Salle County is reversed and remanded for further proceedings consistent with this opinion.

¶ 60 Reversed and remanded.

*Grako v. Bill Walsh Chevrolet-Cadillac Inc.*, 2023 IL App (3d) 220324

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of La Salle County, No. 19-L-74; the Hon. Troy D. Holland, Judge, presiding. |
| **Attorneys for Appellant:** | Christopher Jahnke, of Frankfort Law Group, of Frankfort, for appellant. |
| **Attorneys for Appellee:** | Timothy B. Cantlin, of The Cantlin Law Firm, of Ottawa, for appellees. |