2024 IL App (1st) 230206-U

No. 1-23-0206

First Division
November 25, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| 3SIX5 LOGISTICS, LLC, | ) | Appeal from the |
| | ) | Circuit Court of |
| | ) | Cook County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 20 L 4215 |
| | ) | |
| LAWRENCE RENKO, JONATHAN | ) | |
| FONTANO, RICHARD VINSON, and JMF | ) | |
| SALES CORPORATION, | ) | |
| | ) | Honorable |
| Defendants-Appellees. | ) | Joan E. Powell |
| | ) | Judge, Presiding. |

_____

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Lavin concurred in the judgment.

**ORDER**

¶ 1     *Held*:  The trial court's judgment in favor of defendants is affirmed where the judgment was not against the manifest weight of the evidence.

¶ 2     This appeal arises from an amended complaint filed by plaintiff-appellant 3SIX5 Logistics, LLC (3SIX5) against defendants-appellees Lawrence Renko, Jonathan Fontano, Richard Vinson, and JMF Sales Corporation (JMF). The complaint raised numerous claims, the general gravamen

of which was that defendants, former independent contractors of 3SIX5, began diverting some of 3SIX5's clients to a competitor while still performing services for 3SIX5. Following a bench trial, the trial court ruled in favor of defendants on all counts. For the reasons that follow, we now affirm the trial court's judgment.

¶ 3                                    I. BACKGROUND

¶ 4      3SIX5 is a transportation logistics company owned by Marko Kondic and Jakub Mroczkowski. Kondic and Mroczkowski founded 3SIX5 in 2018 after working in the transportation industry for a number of years as truck drivers. 3SIX5's clients are companies looking to have their products shipped. 3SIX5 serves as the "middleman" between their clients and trucking companies (known as "carriers" in the industry), essentially finding a suitable truck for the client's shipment and coordinating the shipping process. Defendants Renko, Fontano, and Vinson are transportation "brokers" who build relationships with clients and carriers and match the two on behalf of a company like 3SIX5 in exchange for a commission. Renko is the sole shareholder of defendant Valued Logistics Services, Inc. (VLS),[1] and Fontano is the sole shareholder of defendant JMF.

¶ 5      3SIX5's brokers would typically hire Mroczkowski's trucking company, Chill Logistics, to ship goods for 3SIX5's clients. However, because Chill Logistics is relatively small, the brokers would often need to find trucks from different carriers when there were no Chill trucks available. At least as relevant to the current appeal, 3SIX5 did not have an exclusive relationship with any client or carrier, and no client was ever obligated to book a particular number of shipments with 3SIX5. Instead, the clients routinely solicited bids from multiple brokers on a shipment-by-

---

[1] VLS was named as a defendant in the operative complaint below but was not named as a party in this appeal.

shipment basis and generally hired the one with the lowest price. Thus, brokers were in constant contact with both clients and carriers in order to ascertain the clients' shipping needs and offer the most competitive price for each shipment. All clients involved in this appeal used multiple logistics companies to satisfy their overall shipping needs.

¶ 6 Renko is a highly experienced transportation broker with over 20 years in the transportation industry. In the fall of 2018, Kondic and Mroczkowski began negotiating with Renko, whom they knew from their days as truck drivers, about joining 3SIX5 and helping to grow their new business. The two sides reached an oral agreement for Renko to broker shipments through 3SIX5 as an independent contractor in exchange for a 65% commission paid to Renko's company, VLS. As part of the deal, Renko agreed to leverage client relationships he had built in the industry, including that with produce wholesaler Ben B. Schwartz & Sons, Inc. (Ben B. Schwartz). Renko also acquired new clients such as Earthmix Fruit & Vegetable Co. (Earthmix) while working for 3SIX5. 3SIX5 had not done any business with Ben B. Schwartz or Earthmix prior to hiring Renko.

¶ 7 While brokering shipments for 3SIX5, Renko worked from VLS' office in Crystal Lake, Illinois. Renko paid the rent for the office, but 3SIX5 provided a computer, internet access, and phone service, which Renko testified was customary in the industry. 3SIX5 also offered to reimburse Renko for the cost of certain office furniture he had purchased, which Renko accepted. Renko and the other defendants also used 3SIX5 e-mail addresses and 3SIX5's software Ascend TMS to track all shipment information.

¶ 8 Like Renko, Fontano was also a longtime broker with approximately 25 years of experience in the transportation industry. Fontano testified that he learned of 3SIX5 in 2019 from another of their brokers, John Lampros. On May 22, 2019, Fontano signed an "Independent Contractor Agreement" (the JMF Agreement) with 3SIX5 on behalf of his company, JMF. Under

the agreement, JMF agreed to broker loads for 3SIX5 in exchange for a commission. JMF also agreed to use its "best efforts" in brokering shipments and to "devote as much time, skill, labor, and attention as [it] deems necessary" to do so. Notably, the agreement repeatedly characterizes JMF as an "independent contractor" and states that JMF is "neither an agent nor employee of [3SIX5] and has no authority whatsoever to bind [3SIX5] by contract or agreement of any kind."

¶ 9      JMF's most prominent client for 3SIX5 was Alpha Baking, with whom Fontano had done business for more than 20 years. The evidence showed that 3SIX5 had almost no prior relationship with Alpha Baking, handling just "one or two" shipments before the JMF Agreement. This number increased dramatically under Fontano, with 3SIX5 generating nearly $680,000 in gross revenue from Alpha Baking in 2019.

¶ 10      Shortly after signing the JMF Agreement, Fontano took out a personal loan from Mroczkowski in the amount of $9200. On August 30, 2019, 3SIX5 and "JMF Sales/John Fontano" executed a "Revised Exhibit A" to the JMF Agreement stating that "Alpha Baking shall remain a customer of [3SIX5] until the loan repayment has been made complete by John Fontano and/or [JMF]." The Revised Exhibit A also provided that the loan would be repaid by deducting $300 from JMF's weekly commission check. However, the loan was not fully repaid and a balance of approximately $3200 remained at the time of trial.

¶ 11      Vinson testified that he was introduced to 3SIX5 by Renko sometime in 2019. On June 20, 2019, Vinson entered into a written "Independent Contractor Agreement" with 3SIX5 (the Vinson Agreement) that was substantively identical to the JMF Agreement. Thereafter, Vinson brokered shipments through 3SIX5 for a single client, Sunterra Produce, with whom Vinson worked at his previous position.

¶ 12 Defendants' relationships with 3SIX5 proved to be initially successful, with 3SIX5 more than doubling its revenue in 2019. At some point, however, those relationships began to sour. The movement appears to have begun in September 2019, when Fontano "started putting feelers out" for a new job because 3SIX5 was not growing fast enough for him to service his clients. Fontano testified that he openly discussed with Kondic and Mroczkowski that 3SIX5 needed to gain access to more trucks in order for him to properly service his clients. For example, Fontano was unable to bring in his larger clients such as FedEx and UPS because 3SIX5 was too small. Renko gave similar testimony, explaining that clients like Meijer would not work with 3SIX5 because it had access to fewer than 60 trucks.

¶ 13 At the time, Chill Logistics owed 10-15 trucks, but Kondic and Mroczkowski assured defendants that they "absolutely" intended to grow. However, 3SIX5 did not grow fast enough for Fontano and, by November 2019, he was hired as a consultant by Jeep Transport, LLC, a large carrier. During this time, JMF continued to broker Alpha Baking shipments for 3SIX5. However, Fontano then helped create Jeep Transport's brokerage arm, MBrothers Freight, LLC, which did business under the name Jeep Freight. Jeep Freight began operations in early 2020, around the time the relationship between JMF and 3SIX5 disintegrated. Thereafter, Fontano brokered Alpha Baking shipments on behalf of Jeep Freight.

¶ 14 Renko testified that Fontano introduced him to Jeep Freight sometime in late 2019 or early 2020. Renko met with Jeep Freight and decided to transfer his brokerage services there. Renko explained that the "main" reason he chose to leave 3SIX5 was that, contrary to his advice, 3SIX5 failed to obtain a line of credit or factoring service necessary to pay its carriers in a timely manner. Renko testified that the lack of credit resulted in some carriers refusing to work with 3SIX5. Renko also testified that another "huge" factor in his decision to move to Jeep Freight was Jeep Freight's

access to a far greater number of trucks. The evidence showed that Jeep Freight commanded at least 170 Jeep Transport trucks, compared to the 10-15 trucks owned by Chill Logistics. Finally, Renko cited the sense of "distrust" created within 3SIX5 after a meeting in which Mroczkowski accused Kondic of embezzling money. Kondic acknowledged being confronted about stealing money, but denied any wrongdoing.

¶ 15    In early 2020, Kondic became "suspicious" that 3SIX5's revenue was lower than expected for the fourth quarter of 2019. The situation came to a head in February 2020 when Kondic received an e-mail from Richard Hance, Renko's father-in-law and an employee of VLS. Although the e-mail concerned a tracking update for a 3SIX5 shipment, Kondic noticed that it was sent from Hance's "@jeepfreight.com" e-mail address. Immediately upon receiving the Hance e-mail, Kondic drove to VLS' Crystal Lake office to confront Renko about Hance having a Jeep Freight e-mail address. There, Renko explained that he would be leaving 3SIX5 to join Jeep Freight.

¶ 16    After meeting with Renko, Kondic investigated 3SIX5's e-mail server for more evidence of defendants' suspected wrongdoing. At trial, 3SIX5 presented several e-mails it contended were evidence of defendants attempts to "sabotage" 3SIX5 in favor of Jeep Freight. For example, e-mails sent to defendants by Alpha Baking show that Alpha Baking complained about the addition of "holiday surcharges" for certain shipments during late December 2019. Other e-mails from Alpha Baking reference both 3SIX5 shipments and Jeep Freight shipments in the same message, which, according to Kondic, proved that defendants were working for "two companies at one time."

¶ 17    Finally, 3SIX5 submitted several e-mails between Vinson's 3SIX5 address and representatives from the trucking company Trailiner. In one e-mail dated February 28, 2020, Vinson tells Trailiner that all future shipments for a particular client would be run through Jeep

Freight. In a follow-up e-mail sent that same day, Vinson explains that Jeep Freight and 3SIX5 are not affiliated but that he and Renko "are doing work for both." Vinson also states that he and Renko decided to move some accounts to Jeep Freight because "[s]ome of the customers we've been working with wanted access to more assets [*i.e.* trucks]" and Jeep Freight allowed them "access to 300 company assets and open[ed] up more opportunities" for their clients. At trial, Vinson acknowledged that he helped Trailiner get "set up" to move shipments through Jeep Freight as a favor to Renko. However, Renko was the one with the client relationships, and it was therefore his decision to move the clients to Jeep Freight. Vinson did not use his Jeep Freight e-mail address for any purpose other than setting up carriers for Renko.

¶ 18 Kondic testified that, based on the e-mail evidence, he had no choice but to "cut [defendants] all off completely" by canceling their access to Ascend TMS and 3SIX5 e-mail, as well as disconnecting the phone and internet service at VLS' Crystal Lake office. Kondic acknowledged that this effectively terminated defendants' relationship with 3SIX5 because defendants could no longer broker loads without access to Ascend TMS. Kondic revoked defendants' access without warning, and, other than texting Renko "once or twice," he has not spoken to defendants since.

¶ 19 Kondic further testified that he called Alpha Baking in the "late spring, early summer of 2020" but Alpha Baking would not discuss defendants with him. Alpha Baking solicited some bids from 3SIX5, but 3SIX5's prices were "too high" to secure the business. Kondic also reached out to Ben B. Schwartz "a few times," but never got a response. Kondic never attempted to contact Earthmix after cutting defendants off.

¶ 20 3SIX5 filed its initial complaint in this matter on April 14, 2020. It subsequently filed an amended complaint on January 29, 2021, which is the operative complaint for this appeal. The

amended complaint alleges numerous claims against defendants, namely: breach of agreement against Vinson and JMF (counts I and II, respectively); breach of fiduciary duty against Vinson and Renko (counts III and IV, respectively); tortious interference with a contract against Fontano and Renko (counts V and VII, respectively); and tortious interference with a business expectancy against Vinson, Fontano, and Renko (counts VIII, IX, and X, respectively).[2]

¶ 21    Following a bench trial, the trial court ruled for defendants on all counts. In so ruling, the court stated that it considered defendants' testimony to be "highly credible." The court found that defendants did not breach their agreements with 3SIX5, and were in fact substantially hampered in brokering shipments due to 3SIX5's failure to obtain a line of credit and acquire more trucks as promised. The court further found that the provision in the JMF Agreement concerning the loan between Mroczkowski and Fontano was unenforceable for lack of consideration. The court noted that the loan was a personal one, and the repayment was "for [Fontano] and Mroczkowski to work out." Finally, the court found defendants owed no fiduciary duty to 3SIX5, and did not interfere with any business expectancy because the clients in question worked with many logistics companies and were not exclusive to 3SIX5. Indeed, the "nature of the business" made 3SIX5's expectation of exclusivity impossible.

¶ 22    This appeal followed.


¶ 23                                    II. ANALYSIS

¶ 24    On appeal, 3SIX5 advances arguments as to why the trial court erred in ruling for defendants on each count of the amended complaint. The parties agree that the standard of review

---

[2] Count VI of the amended complaint also raised a claim for inducement to commit a breach of fiduciary duty against Jeep Freight. However, that count was dismissed prior to trial, and Jeep Freight is not a party to this appeal.

following a bench trial is whether the trial court's judgment is against the manifest weight of the evidence. *Bullet Express, Inc. v. New Way Logistics, Inc.*, 2016 IL App (1st) 160651, ¶ 60. A judgment is against the manifest weight of the evidence only where the opposite conclusion is apparent, or where the court's findings are unreasonable, arbitrary, or not based on the evidence. *Id.* Additionally, the trial court's determinations on matters of witness credibility are entitled to great deference on appeal, as the trial court is in the best position to evaluate those issues. *Id.* When there is contradictory testimony that could support more than one conclusion, a reviewing court will not disturb the trial court's findings unless the opposite finding is readily apparent. *Id.*

¶ 25                                    A. Breach of Contract

¶ 26     3SIX5 first contends that the trial court erred in finding that Vinson and JMF did not breach their respective contracts. To establish a claim for breach of contract, a plaintiff must prove (1) the existence of a valid and enforceable contract, (2) performance by the plaintiff, (3) breach of the contract by the defendant, and (4) damages resulting from the defendant's breach. *Carlson v. Rehabilitation Institute of Chicago*, 2016 IL App (1st) 143853, ¶ 13.

¶ 27     In this case, 3SIX5 contends that Vinson breached his agreement by "compet[ing] against 3SIX5" in favor of Jeep Freight. Specifically, 3SIX5 cites Vinson's "conversations with Renko about working for Jeep Freight" and his e-mail correspondence with Trailiner.

¶ 28     As he acknowledged at trial, the evidence showed that Vinson assisted Renko in setting up carriers to move shipments for Jeep Freight. However, 3SIX5 did not produce any evidence to suggest that Vinson played a role in dissuading clients from working with 3SIX5. Both Renko and Vinson testified that the decision to move Renko's clients from 3SIX5 to Jeep Freight was Renko's alone. This was entirely reasonable, as Renko was the only one who had relationships with the

clients in question. Thus, to the extent any of defendants controlled whether 3SIX5 retained those clients, it was Renko.

¶ 29    We also note that there was nothing in Renko's agreement with 3SIX5 that required him to broker shipments exclusively for 3SIX5. To the contrary, Renko gave undisputed testimony that a major term of his oral agreement with 3SIX5 was that he would retain his complete independence. Moreover, the trial court found that Renko transitioned his clients to Jeep Freight for legitimate business reasons such as 3SIX5's lack of credit and available trucks. Indeed, the trial court found that 3SIX5's failure to pay carriers in a timely manner "made Renko's job impossible." This conclusion is supported by the evidence, and 3SIX5 has not presented any evidence to conclude otherwise. Thus, the court's determination that Vinson did not breach his agreement by giving minimal assistance to Renko was not against the manifest weight of the evidence.

¶ 30    3SIX5 also contends that JMF breached its agreement when Fontano began diverting clients such as Alpha Baking to Jeep Freight. However, the evidence showed that, from the beginning of their relationship, Fontano made it known to 3SIX5 that he would need to find another job if 3SIX5 did not grow large enough to service his clients. 3SIX5 assured Fontano that they would grow, but never obtained significantly more trucks during Fontano's tenure. Unsurprisingly, Fontano moved on, initially joining Jeep Transport and, later, helping to start Jeep Freight.

¶ 31    We also note JMF continued to broker Alpha Baking shipments for 3SIX5 after Fontano joined Jeep Transport. In fact, Fontano testified that JMF only stopped brokering shipments through 3SIX5 because 3SIX5 revoked its access to Ascend TMS. The documentary evidence corroborates this claim because, as 3SIX5 concedes, it continued to book Alpha Baking shipments as late as February 2020. Thus, it appears from the evidence that 3SIX5's loss of Alpha Baking

business was attributable to its own conduct rather than any breach by Fontano. Accordingly, the trial court's judgment was not against the manifest weight of the evidence.

¶ 32    3SIX5 also maintains that JMF violated the Revised Exhibit A of its agreement, which provided that "Alpha Baking shall remain a customer of [3SIX5]" until Fontano repaid his loan from Mroczkowski. Defendants argue that, as the trial court found, this provision is unenforceable because it is not supported by any consideration. A modification of a contract, like the formation of a new contract, is valid and enforceable only if it is supported by consideration. *Urban Sites of Chicago, LLC v. Crown Castle USA*, 2012 IL App (1st) 111880, ¶ 38. " 'Consideration for a contract consists either of some right, interest, profit, or benefit accruing to one party or some forbearance, detriment, loss of responsibility given, suffered, or undertaken by the other.' " *Wilmington Savings Fund Society, FSB as Trustee of Brougham Fund I Trust v. Herzog*, 2024 IL App (1st) 221467, ¶ 50 (quoting *Johnson v. Maki & Associates, Inc.*, 289 Ill. App. 3d 1023, 1028 (1997)).

¶ 33    3SIX5 has failed to identify any consideration supporting the loan provision in the JMF Agreement, either in the trial court or on appeal. As plaintiff, it was 3SIX5's burden to prove the loan provision was valid. 3SIX5 has not attempted to do so. In any event, it is undisputed that the loan was a personal one from Mroczkowski, who is not a party to the JMF Agreement. Mroczkowski himself confirmed that 3SIX5 had no involvement in the loan, and that the provision was added simply as "a way to make sure [he] get[s] the money." Accordingly, we agree with the trial court that the provision is unenforceable for lack of consideration. The provision is therefore not a basis on which to disturb the trial court's judgment.

¶ 34                                    B. Breach of Fiduciary Duty

¶ 35    3SIX5 next argues that the trial court erred in finding that Vinson and Renko did not breach their fiduciary duties to 3SIX5 in transitioning clients such as Ben B. Schwartz and Earthmix to Jeep Freight. To establish a claim for breach of fiduciary duty, a plaintiff must prove (1) the existence of a fiduciary duty, (2) a breach of that duty, and (3) an injury that was proximately caused by the breach. *Lawlor v. North American Corp. of Illinois*, 2012 IL 112530, ¶ 69. A fiduciary duty may exist as a matter of law, such as the relationship between an attorney and client, an agent and principal, or members of a joint partnership. *Doherty v. Country Faire Conversion, LLC*, 2020 IL App (1st), 192385, ¶ 42. Where a fiduciary duty does not exist as a matter of law, the party seeking relief must prove the special circumstances from which a fiduciary duty arises by clear and convincing evidence. *Id.*

¶ 36    Here, the trial court found that defendants did not owe fiduciary duties to 3SIX5. In arguing for an opposite conclusion, 3SIX5 cites just two points of law: (1) *Advantage Marketing Group, Inc. v. Keane*, 2019 IL App (1st) 181126, ¶ 28, where this court held that a "key employee" who owned a 35% stake in the plaintiff company was a fiduciary, and (2) the Restatement (3d) of Agency, § 8.01 (2006), which states that "[a]ll who assent to act on behalf of another person and subject to that person's control are common-law agents" who owe a fiduciary duty to the principal. 3SIX5 also points out that it provided defendants with access to 3SIX5 e-mail and Ascend TMS, and paid for a computer, furniture, and phone/internet service at VLS' Crystal Lake office.

¶ 37    3SIX5's arguments are unpersuasive. To the extent 3SIX5 suggests that a fiduciary duty arises from an employer-employee relationship, this notion is belied by the record. Vinson and Renko both testified that they were independent contractors, which was undisputed at trial. Additionally, the Vinson Agreement—which was drafted by 3SIX5 and its counsel—is entitled "Independent Contractor Agreement" and refers to Vinson as "Independent Contractor" on dozens

of occasions. Thus, the record is clear that defendants were independent contractors rather than employees.

¶ 38     We are mindful that defendants' status as independent contractors does not necessarily foreclose the matter, as, in some instances, a person may be both an independent contractor and an agent owing a fiduciary duty. See, *e.g.*, *Sobel v. Franks*, 26 Ill. App. 3d 670, 680 (1994). There is no "precise formula" as to when an independent contractor acts as an agent, and the inquiry rests upon the facts and circumstances of each case. *Theofanis v. Sarrafi*, 339 Ill. App. 3d 460, 479 (2003). Relevant considerations include the right to terminate the relationship, the nature and character of the work, and the degree of control over the work retained by each party. *Id.* "The presence of contractual provisions subjecting the person to control over the manner of doing the work is a traditional *indicia* that a person's status as an independent contractor should be negated." *Petrovich v. Share Health Plan of Illinois, Inc.*, 188 Ill. 2d 17, 46-47 (1999).

¶ 39     In this case, Renko did not have any contract with 3SIX5, and there is little basis in the Vinson Agreement to establish a fiduciary relationship. In fact, the Vinson Agreement expressly disclaims any agent-principal relationship, stating that Vinson "is neither an agent nor employee of [3SIX5] and has no authority whatsoever to bind [3SIX5] by contract or agreement of any kind." There was also virtually no testimony that 3SIX5 controlled or supervised defendants' work in any way. To the contrary, Vinson testified that he had almost no contact with 3SIX5, and Renko testified that VLS operated as a "fully sustainable office" that serviced its clients independently from 3SIX5. Thus, 3SIX5 has fallen well short of establishing that Vinson or Renko owed a fiduciary duty. Accordingly, the trial court did not err in rejecting 3SIX5's claims for breach of fiduciary duty.

¶ 40                           C. Tortious Interference with a Contract

¶ 41    3SIX5 next argues that the trial court erred in finding that Fontano and Renko did not tortiously interfere with a contract. To prevail on a claim of tortious interference with a contract, a plaintiff must prove: (1) the existence of a valid and enforceable contract between the plaintiff and third party; (2) that the defendant was aware of the contract; (3) that the defendant intentionally and unjustifiably induced a breach of the contract; (4) that the wrongful conduct of defendant caused a subsequent breach of the contract by the third party; and (5) that the plaintiff was damaged as a result. *Bank Financial, FSB v. Brandwein*, 2015 IL App (1st) 143956, ¶ 43.

¶ 42    With respect to Renko, 3SIX5 contends that Renko tortiously interfered with the Vinson Agreement when he "told Vinson about Jeep Freight, offered to work something out for Vinson with Jeep Freight, offered to put Vinson in touch with someone at Jeep Freight, and had conversations with Vinson about diverting customers away from 3SIX5." These points are unavailing. First, there was no evidence that Renko induced Vinson to divert any clients away from 3SIX5. Rather, Renko merely "induced" Vinson to give him limited assistance in setting up carriers to move shipments from Jeep Freight. For the same reasons explained above, we agree with the trial court that this did not constitute a breach of contract. Similarly, Renko offering to connect Vinson with Jeep Freight, without more, cannot constitute tortious interference. Inducement to breach a contract requires a degree of active persuasion or encouragement that goes beyond merely providing information. *In re Estate of Albergo*, 275 Ill. App. 3d 439, 446 (1995). What is more, the trial evidence showed that Vinson did not join Jeep Freight, but instead quit the transportation industry altogether after his relationship with 3SIX5 was terminated. Thus, the trial court's determination that Renko did not tortiously interfere with the Vinson agreement was not against the manifest weight of the evidence.

¶ 43    3SIX5 also argues that Fontano tortiously interfered with the JMF Agreement when he assisted in the formation of Jeep Freight and ultimately transitioned Alpha Baking and other clients away from 3SIX5. In response, defendants argue that 3SIX5's claim must fail because JMF was "nothing more than a d/b/a" and it is well-established that Fontano could not have tortiously interfered with his own contract. 3SIX5 counters that, as a corporation, JMF was a "legal entity that existed separately and distinctly from Fontano."

¶ 44    It is true that a party cannot tortiously interfere with his own contract. *Koehler v. Packer Group, Inc.*, 2016 IL App (1st) 142767, ¶ 43. 3SIX5 is also correct that, as a general matter, a corporation is a legal entity that is separate and distinct from its shareholders, directors, and officers. *Strauss v. City of Chicago*, 2022 IL 127149, ¶ 45. The Seventh Circuit, applying Illinois law, considered the interaction of these legal principles in *Rao v. Rao*, 718 F. 2d 219, 225 (7th Cir. 1983). There, a former employee of the Mohan Corporation sued Mohan, the corporation's sole officer and director, for tortiously inducing the corporation to breach his employment contract. *Id.* at 221. The Seventh Circuit held that the former employee could not sue Mohan for tortious interference, explaining that "[b]ecause Mohan is Mohan Corporation's sole shareholder, officer, and director, therefore, we are convinced that Mohan would be considered by an Illinois court not to be a separate entity capable of inducing Mohan Corporation to breach its contracts." *Id.* at 225.

¶ 45    As best we can surmise, no Illinois case has directly addressed the issue of whether the sole shareholder of a corporation can tortiously interfere with the corporation's contracts. However, we agree with the logic of *Rao*, at least as applied to the specific facts of this case. Like in *Rao*, Fontano is the sole shareholder, officer, and director of JMF. Fontano described JMF as a "holding company," and its only two employees were Fontano's wife and son. Indeed, 3SIX5 itself argues

that Fontano had "full authority and control over JMF." Under these circumstances, the principle that one cannot tortiously interfere with his own contract is fatal to 3SIX5's claim.

¶ 46    Regardless, even if we were to find that Fontano could have interfered with JMF's contracts, we would still affirm the trial court's judgment. A claim for tortious interference with a contract requires the plaintiff to show the defendant unjustifiably induced a breach of a contract. *Brandwein*, 2015 IL App (1st) 143956, ¶ 43. However, as discussed above, the trial court credited Fontano and the other defendants' testimony that they could not perform under their agreements due to factors such as 3SIX5's lack of credit and available trucks. 3SIX5 has presented nothing to show that that determination was against the manifest weight of the evidence. Thus, 3SIX5 has not proven any breach of contract or wrongdoing by Fontano. The claim therefore fails.

¶ 47                     D. Tortious Interference with a Business Expectancy

¶ 48    Finally, 3SIX5 argues that the trial court erred in ruling that Renko, Vinson, and Fontano did not tortiously interfere with its business expectancy to continue working with clients such as Ben B. Schwartz, Alpha Baking, and Earthmix. To establish a claim of tortious interference with a business expectancy, a plaintiff must prove: (1) the existence of a reasonable expectation of entering into a valid business relationship, (2) the defendant's knowledge of the expectancy, (3) the defendant's intentional and unjustified interference that prevents the expectancy from being realized, and (4) damages resulting from the interference. *State Auto Property & Casualty Insurance Company v. Distinctive Foods, LLC*, 2024 IL App (1st) 221396, ¶ 16. The plaintiff must go beyond proving that the defendant successfully ended its business expectancy. *Grako v. Bill Walsh Chevrolet-Cadillac, Inc.*, 2023 IL App (3d) 220324, ¶ 36. Rather, the plaintiff must show that the defendant has "committed some impropriety" in ending the plaintiff's business relationship. *Id.*

¶ 49    The trial court found that 3SIX5 failed to establish a reasonable expectation of continuing to work with the clients in question because no business was ever guaranteed in the industry. Indeed, it is undisputed that while relationships between clients and brokers are important, clients are primarily price sensitive and therefore solicit bids from multiple brokers in a competitive environment. The evidence also showed that the clients in question used many logistics companies to ship their products.

¶ 50    On appeal, 3SIX5 attacks the trial court's finding with the somewhat conclusory assertion that it "had every reason to believe its business with Alpha Baking, Ben B. Schwartz, and Earthmix would have continued to grow, or at least remain stable ***." 3SIX5's position ignores not only the unguaranteed nature of the logistics industry, but also defendants' testimony that their clients and carriers were growing unhappy with the dearth of available trucks and slow payments caused by lack of credit. Defendants also testified that they made these concerns known to 3SIX5, but 3SIX5 did not rectify the issues. Under these circumstances, it cannot be said that 3SIX5 lost business due to any impropriety from defendants, nor was it reasonable for 3SIX5 to expect to continue its business relationships on the same terms.

¶ 51    Nevertheless, 3SIX5 casts defendants' testimony as speculative, pointing out that "there is no evidence in the record from any of 3SIX5's customers" as to why they ceased doing business with it.  However, this lack of direct evidence is not necessarily helpful to 3SIX5. It is 3SIX5's burden, as the plaintiff, to prove that it was defendants' unjustified interference that caused clients to take their business elsewhere. The lack of proof is further highlighted by Kondic's admission that 3SIX5 did little to retain the clients in question after abruptly cutting defendants off. Specifically, Kondic made a half-hearted effort to reach out to Ben B. Schwartz "a few times" with no response, and did not attempt to contact Earthmix at all. Although Kondic had some further

communication with Alpha Baking, they did not discuss anything to do with defendants. Moreover, 3SIX5 was able to submit bids for several Alpha Baking shipments, albeit unsuccessfully. In any event, the trial court clearly credited defendants' explanations as to why 3SIX5 was unable to remain competitive. The court's determinations are entitled to significant deference on appeal, and 3SIX5 has given us no reason to depart from them. Accordingly, we cannot say that the court's judgment was against the manifest weight of the evidence as to 3SIX5's claims for tortious interference with a business expectancy.

¶ 52                                    III. CONCLUSION

¶ 53    For the reasons stated, we affirm the trial court's judgment with respect to all counts of 3SIX5's amended complaint.

¶ 54    Affirmed.