2024 IL App (1st) 221524-U
No. 1-22-1524

FIRST DIVISION
August 26, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| BRYAN YOUNGE, | ) | Appeal from the Circuit Court of Cook County. |
| | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 2019 CH 15699 |
| | ) | |
| CUSHMAN & WAKEFIELD, INC.; CUSHMAN & WAKEFIELD OF ILLINOIS, INC.; ERIC LEWIS; and MICHAEL SCHAEFFER, | ) ) ) | |
| | ) | The Honorable |
| | ) | James E. Snyder, |
| Defendant-Appellees. | ) | Judge Presiding. |

_____

JUSTICE PUCINSKI delivered the judgment of the court.
Justices Cobbs and Coghlan concurred in the judgment.

**ORDER**

*Held*: Summary judgment in favor of defendants was warranted as to some, but not all, of plaintiff's claims. The circuit court properly granted summary judgment to all defendants with respect to plaintiff's claim of intentional infliction of emotional distress. Summary judgment on plaintiff's tortious interference claim was warranted against defendant Michael Schaeffer, but is reversed with respect to Eric Lewis. We also reverse dismissal of the negligent supervision claim. We thus affirm in part and reverse in part. We remand for proceedings on the remaining claims: tortious interference against defendant Lewis and negligent supervision against Cushman.

¶ 1    Plaintiff-appellant Bryan Younge appeals from the circuit court's entry of summary judgment dismissing all three counts of his first amended complaint against his former employer, Cushman & Wakefield of Illinois, Inc. (together with Cushman & Wakefield Inc., "Cushman") and two of his former colleagues, Michael Schaeffer and Eric Lewis. For the following reasons, we find (1) summary judgment on the tortious interference count was properly entered in favor of Schaeffer but was not warranted in favor of Lewis; (2) we affirm the dismissal of the count asserting intentional infliction of emotional distress against all defendants; and (3) we reverse the dismissal of the remaining negligent supervision count against Cushman. We thus affirm in part, reverse in part, and remand for further proceedings on the two surviving claims: tortious interference against Lewis and negligent supervision against Cushman.

¶ 2                                          BACKGROUND

¶ 3    Younge was employed by Cushman from July 2003 until his resignation in June 2016. Younge worked in Cushman's Chicago office in the field of real estate valuation and appraisal. The lawsuit centers around events in 2015 and 2016, culminating in issuance of a performance improvement plan in December 2015 and Younge's departure from Cushman.

¶ 4    At relevant times, Younge was part of three different practice groups within Cushman, including the Hospitality and Gaming Group (H&G), which was engaged in appraising real estate assets such as hotels. Defendant Eric Lewis, based in Cushman's New York office, was the practice leader of the H&G group.

¶ 5    Younge was also a member of the Valuation for Financial Reporting (VFR) group. Marius Andreasen was the leader of the VFR group. Younge was also a managing director of the Sports and Entertainment Group (S&E).

¶ 6        At all relevant times, defendant Schaeffer was Younge's supervisor. Both Lewis and Schaeffer reported to Nicole Urquhart-Bradley, identified in the record as the "Executive Managing Director, U.S. Lead" of Cushman's "Valuation and Advisory" group. The record reflects that the Valuation and Advisory group encompassed the H&G and VFR practice groups.

¶ 7        It is undisputed that Younge was one of Cushman's top producers in terms of revenue generated. In 2014, he produced $1,706,53 in gross revenue, across all groups.

¶ 8        <u>Reduction of Younge's Territory in the H&G Group</u>

¶ 9        In approximately June 2015, the geographic territories for which Younge was responsible in the H&G group was significantly reduced. Younge previously was responsible for appraising properties across 11 states, but his territory was reduced to consist of three states: Illinois, Wisconsin, and western Indiana. Lewis, as practice head of the H&G group, made the decision to reduce Younge's territory. A newly hired appraiser named Raj Shah took over some of the territory that had previously been Younge's territory.

¶ 10        <u>Internal Criticism of Younge and Preparation of Performance Improvement Plan</u>

¶ 11        The record reflects that in late 2015, there were internal communications expressing concerns about Younge's performance and integrity, primarily from Lewis and Andreasen, which led to creation of a Performance Improvement Plan (PIP).

¶ 12        On October 20, 2015, Schaeffer sent an email to a number of Cushman officers, including Urquhart-Bradley, describing concerns with Younge. Schaeffer indicated that neither Lewis or Andreasen wanted Younge to continue in their respective practice groups, the H&G group and the VFR group. Schaeffer indicated that an audit of assignments performed by Younge "found four (4) engagements, where no licensing was found and provided." In the same email, Schaeffer reported that Lewis sought Younge's removal from the H&G group "due to not

following Protocol regarding QC and lack of judgment." Schaeffer also reported that Andreasen requested that Younge be removed from the VFR group "due to not following Protocol regarding QC[,] lack of judgment, quality of reporting and not involving members of the group when opportunities arise."

¶ 13    Emails from early November 2015 show that Urquhart-Bradley and Lewis asked Jennifer Ships, head of Cushman's Human Resources, to gather information about prior issues with Younge. Ships reported that "conversations took place with Bryan" in 2012 and 2014, and that there were two prior client complaints involving Younge, only one of which was found to be "valid."

¶ 14    On November 11, 2015, Schaeffer emailed Lewis and Andreasen, copying Urquhart-Bradley and James Moran, another Cushman officer in the Valuation and Advisory Group. Schaeffer stated he was in the process of "completing my review comments regarding the situations surrounding Bryan Younge." Schaeffer asked Lewis and Andreason to provide "specific examples of where Bryan Younge has not complied with your Protocols." Schaeffer told them to "Keep in mind that you must have back-up for what you include. Hearsay is not acceptable."

¶ 15    The next day, Lewis sent an email to Schaeffer, Andreason, and Urquhart-Bradley in which he stated "I want [Younge] out of my group". Lewis described instances where Younge allegedly violated H&G group protocols, and said: "If he is willing to be that reckless within his own group, how can he be trusted to abide by the rules, general common sense and ethical behavior anywhere else?"

¶ 16    Lewis further stated:

"[Younge's] qual[ifications], education, and background are irrelevant. What is relevant is his performance which has been unethical, greed-driven, and destructive. If I, as lead of the H&G Group, don't want him in my group, that is my decision as what I am being paid to do is run that group – which I cannot do with someone like Bryan undermining our efforts."

¶ 17                    Performance Improvement Plan

¶ 18    Based largely on input from Lewis and Andreasen, Schaeffer prepared a five-page PIP, which he presented to Younge on December 7, 2015. The PIP specified a number of "Performance Discpreanc[ies]". Among these, it stated that an audit found that a number of Younge's valuation assignments "did not meet or compromised State Licensing Requirements."

¶ 19    Another "Performance Discrepancy" was that "Hospitality Group Leader (Eric Lewis) found non-compliance with procedures and protocols, as well as the formal Quality Control/Review process." As examples, the PIP indicated that Younge had prepared two separate reports (one for "Red Roof Inn Portfolio" and another for "47 Lodging Facilities") without involving or informing the H&G Group.

¶ 20    The PIP identified another "Performance Discrepancy" related to Younge's preparation of a report involving a theater in Montclair, New Jersey. The PIP stated that in the review process, "it was found [there was] no consultation with the local [Cushman] Staff member during the preparation process." The PIP also cited a June 2015 "assignment for Home Federal Savings" where the "Client [was] not satisfied with work product." Elsewhere, the PIP stated that a recent audit "found approximately 50 assignments (2011-2015) lack and/or do not comply with the

Midwest File Management/Retention Policy & Procedures," citing "Missing and/or partial missing documents."

¶ 21     Among other "Action Steps," the PIP required that for Younge's future work in the H&G group, "all Letters of Engagement must be reviewed and approved by Eric Lewis prior to client submission." The PIP warned that failure to abide by H&G protocols "may result in expulsion from the H&G Group and possible termination."

¶ 22     The PIP further indicated that Younge would need to focus on the S&E group and would no longer work for Andreasen's VFR Group. It directed that Younge "Must be fully dedicated to the Sports & Entertainment Group. With the VFR *** now mature with sufficient staffing, all VFR opportunities *** must be performed by dedicated VFR members."

¶ 23     The PIP form indicated that it should "include [a] due date" for implementation of each stated goal and action step. However, Younge's PIP did not specify any particular due dates by which he must complete any goal or satisfy action step.

¶ 24     Schaeffer presented the PIP to Young on December 7, 2015. Later that day, Schaeffer emailed a number of Cushman officers that he "[p]ersonally met with Bryan Younge this morning" and was "confident he will turn the corner." Schaeffer stated that "[e]verything was communicated, especially the licensing and protocol issues and will continue to monitor." Schaeffer subsequently sent copy of the PIP to Younge.

¶ 25     On January 25, 2016, Younge emailed Urquhart-Bradley and Ships, requesting to schedule a phone call with them and Schaeffer concerning the PIP. Younge stated that he had "most of my written response prepared but I will need you both present to round out my remaining questions." Urquhart-Bradley indicated she would "schedule some time" the following week to discuss.

¶ 26                    Younge Accepts an Employment Offer Elsewhere

¶ 27        On or about February 10, 2016, Younge signed an employment offer letter from Colliers International Valuation & Advisory Services, LLC (Colliers). That letter specified a start date of March 21, 2016.

¶ 28                         Younge Leaves the H&G Group

¶ 29        On February 24, 2016, Younge sent an email announcing he was leaving the H&G Group, citing a need to focus on the S&E practice. In that email, Younge stated: "Beginning next month, the Sports and Entertainment Specialty practice will be undergoing an injection of focused development and expansion efforts which will require my full attention for the foreseeable future." At his deposition, Younge testified that this statement was truthful, but it did not "tell the whole story." He also testified that he was "forced" to send the email and believed "If I didn't send that, I was going to be fired."

¶ 30                    Subsequent Communications About the PIP

¶ 31        Sometime in February 2016, Younge met with Schaeffer to discuss Younge's concerns with the PIP. Younge communicated that he believed the PIP contained misstatements. Schaeffer testified in his deposition that they reviewed the PIP and Schaeffer made notes. Schaeffer said Younge wrote a "list of items that I promised I would circle back with him."  Schaeffer recalled that it "was not a good conversation" and that he was very "disappointed" and "very hurt."

¶ 32        On February 26, 2016, Younge sent an email to Lewis (copying Schaeffer, Urquhart-Bradley, and others) with a number of questions about the PIP. Younge stated that Schaeffer had "re-affirmed some items in my PIP that still do not make sense to me." Younge disputed certain items in the PIP. The record does not reflect whether Lewis responded directly to that email.

¶ 33    On March 4, 2016, Younge sent another email to Lewis in which Younge again disputed the accuracy of the PIP. Among other items, Younge maintained that (contrary to the PIP) Lewis did have prior knowledge of the "47-hotel portfolio." Younge referenced a call earlier that day and told Lewis:

> "There are a number of other items we discussed on the call that are equally as problematic ***. There are other statements in the PIP you made that we agreed should never have been in there and will be coming out. Could you please acknowledge that these items will be removed? I will also need you to furnish proof, documents or some level of detail behind any other entry you have in there that will not be coming out of the document."

Younge also requested that he be sent the "revised PIP" for his review.

¶ 34    On March 7, 2016, Younge emailed asking for an "ETA on the revised PIP." The same day, Urquhart-Bradley responded to Younge that Lewis was out of the country "so revisions will have to wait until he returns." On March 16, 2016, Younge emailed Lewis to "Please give me an update." Lewis forwarded that message to Schaeffer, Urquhart-Bradley, Moran, and Ships, telling them "we need to have a discussion before there is a response." The record does not show whether Lewis replied to Younge directly. The record does not reflect that anyone at Cushman ever drafted a revised PIP.

¶ 35                    Younge's Resignation from Cushman

¶ 36    On March 21, 2016, Younge sent an email in which he resigned from Cushman "effective immediately." This was the same date as the start date referenced in the February 2016 offer letter from Colliers.

¶ 37                          Younge Commences this Lawsuit

¶ 38        In November 2017, Younge commenced this action by filing a five-count complaint. Count I alleged "tortious interference with prospective economic advantage" against Lewis and Schaeffer. Count II alleged intentional inflection of emotional distress (IIED) against all defendants. Count III alleged "negligent retention and supervision" against Cushman for failing to discipline Lewis and Schaeffer. Counts IV and V alleged defamation against Lewis and Cushman.

¶ 39        Defendants filed a motion to dismiss. In July 2018, the trial court granted the motion to dismiss with respect to the defamation counts, without prejudice.

¶ 40        In August 2018, Younge filed his first amended complaint, which maintained the claims of tortious interference against Lewis and Schaeffer (count I), IIED against all defendants (count II), and negligent retention and supervision against Cushman (count III).

¶ 41        In that pleading, Younge generally alleged that he had an "exemplary work record" at Cushman, but that Lewis "became unhappy" with Younge's success and compensation. Lewis allegedly "became enraged that he was losing out on compensation which he believed he was entitled to receive due to Younge's work." Younge allged that, to induce his removal from the H&G group, Lewis "fabricated" false statements to include in the PIP and induced Schaeffer to implement the PIP. Younge claimed that as a result, his reputation and ability to earn income at Cushman was destroyed, and his "income significantly declined." Younge alleged that due to "the fabricated PIP and subsequent demotion," he was "forced to resign."

¶ 42        In their answer, defendants admitted that "Lewis attempted to have Younge removed from the Hotel Group." Defendants denied that the PIP was fabricated or that it contained false statements.

¶ 43                                    Deposition Testimony

¶ 44          The record reflects the parties conducted several depositions, including of Younge, Lewis, Schaeffer, Urquhart-Bradley, and David Gray.

¶ 45                                          Younge

¶ 46          Younge testified that the only person he reported to was Schaeffer, but that the "specialty practice groups" were "overseen" by Urquhart-Bradley and Gray.

¶ 47          Younge testified that he interacted "almost constantly" with Lewis, who was the H&G practice leader. He recalled testified that in prior years, Lewis had told him to change the way he was doing things or he would not have a future in the group. Younge testified that in 2015, when he asked Lewis why his geographic responsibility was being significantly reduced, Lewis "didn't give an answer" but told Younge to be a "team player." Younge also recalled an incident in September or October 2015 in which Lewis told him "you're done in this group." After the reduction of territory, he was still a member of the H&G group but "felt like I was on probation." He testified that after the reduction in his H&G territory, he had to rely more on the VFR group and the S&E group for work.

¶ 48          Younge testified that when the PIP was implemented in December 2015, he was removed from Andreasen's VFR group. Younge testified that he expressed concerns about the PIP to several officers at Cushman and tried to have it revised, but "it never happened." He recalled telling Schaeffer repeatedly that the PIP was fabricated, reckless and was "destroying my career." He recalled that Schaeffer said he would "look into it," but the PIP was not modified. He recalled asking another Cushman officer, Janes Moran, how to "correct all of the damage that has been done to me as a result of this bogus PIP" but he just "got the runaround."

¶ 49        Younge acknowledged he signed an offer letter in February 2016 with Colliers, after he "learned that Eric [Lewis] was already looking for my replacement." At the time, he believed he "didn't have a choice." He testified that even after he signed that letter, he "still tried to figure out a way to make it work" at Cushman and tried unsuccessfully to get the PIP revised or removed. He testified that his compensation at Colliers was a "significant reduction" from what he earned at Cushman.

¶ 50                                        Lewis

¶ 51        In his deposition, Lewis stated that he was head of the H&G group from 2005 to 2018. Lewis acknowledged that Younge's territories were reduced in approximately June 2015. He testified that in order to increase revenue, more people were being added to the team, which resulted in each appraiser's territory being reduced. Thus, he stated that adding members to the group "naturally shrinks the territory of existing members." However, he indicated that this did not necessarily mean a reduction in revenue per appraiser, due to "the greater synergy, greater economy of scale" that could come with more group members. He testified that a new hire, Raj Shah, took over some of Younge's territory.

¶ 52        Lewis elsewhere testified that Younge "proved to be very difficult to  manage" and "ran too fast." He claimed that Younge "did not follow protocols or in many cases what we would view as common sense *** oftentimes being successful in generating large fees for himself at the expense of other hospitality and gaming group members." Lewis testified he spoke to Younge a number of times about "cleaning up his act," but Younge did not change.

¶ 53        Lewis acknowledged that as of 2015, he sought Younge's removal from the H&G group because he "continued to be a problem."  However, Lewis stated that "no final decision was

made" on that before Younge resigned from Cushman. Lewis claimed that Younge "left before we even had a chance to address the items in the PIP that was presented."

¶ 54                                                    Schaeffer

¶ 55        Schaeffer acknowledged that both Lewis and Andreasen expressed that they wanted Younge removed from their respective practice groups. Schaeffer stated he had opposed Lewis' request to remove Younge from the H&G Group. However, he agreed to Younge's removal from the VFR group because Andreasen had "finally matured" as the leader of VFR, and "we wanted [Younge] to concentrate on his Sports and Entertainment Practice Group, which was his practice group to lead."

¶ 56        Schaeffer testified that he prepared the PIP after gathering information from several people. The information about Younge's failure to comply with state licensing was based on an audit conducted by Cindy Pool and Donna Stritch. Pool was also the source of the PIP's statement that 50 of Younge's assignments did not comply with Cushman's file retention policy.

¶ 57        Schaeffer testified that Lewis was the source of information for the PIP's statement that Younge did not comply with H&G procedures and protocols. To Schaeffer's knowledge, no one besides Lewis verified the information from Lewis. Schaeffer relied on Andreasen as the source of information relating to the PIP's statement that Younge was not complying with VFR group protocols.

¶ 58        Schaeffer testified that he discussed the PIP with Younge. He recalled a February 2016 meeting in which he promised Younge that he would follow up on certain items, but "time ran out" because Younge resigned. Schaeffer testified he was convinced "that this could have been worked out but [Younge] voluntarily resigned." Schaeffer believed Young "had a very bright

future in my opinion at Cushman *** if he would just have continued with the Sports and Entertainment" group.

¶ 59                                    Gray

¶ 60        Gray testified that as of December 2015, he was chief operating officer of the Valuation and Advisory group, which encompassed the H&G and VFR specialty groups.

¶ 61        Gray recalled speaking with Lewis about the fact that Lewis "did not want [Younge] in the hotel and gaming group anymore." When asked why he thought Lewis wanted Younge removed from the H&G Group, Gray testified he was not sure, but Lewis "seemed to have a thing for Bryan for as long as Bryan was in the group. And I always believed that stemmed from a combination of the amount of money that Bryan made as well as *** the fact that Bryan was able to perform the VFR work and wasn't sharing that work with the remainder of the hospitality and gaming group."

¶ 62        Gray testified that Lewis had been frustrated with Younge for "as long as I could remember" and that Lewis "had a number of issues" with him, including "he thought [Younge] was greedy." Gray recalled that Lewis "was always frustrated that [Younge] would keep the absolute lion's share of the fees" for clients that Younge brought in. Gray testified this was "the pot calling the kettle black" because Lewis was "one of the greediest individuals" he ever worked with.

¶ 63        Gray recalled Lewis informing him that "we're preparing a PIP over the quality of [Younge's] work." Gray responded that if Younge was not qualified for the H&G Group, he should be "let go" from Cushman altogether because Cushman should not have "a different set of quality standards for one practice group than the other." Gray agreed that he understood that

Lewis was preparing the PIP in order to remove Younge from the H&G group. Gray testified that he notified Urquhart-Bradley of this conversation.

¶ 64 Gray stated that he was not involved in drafting the PIP. He recalled that when he saw it, he told Urquhart-Bradley that "this is going into end up being a big problem" and "I hope [Younge] doesn't sue us." In Gray's view, the PIP was not fully accurate and it was "obvious that this PIP was prepared in an effort to get somebody to leave." In his view, the "action steps" in the PIP were "road blocks" that would have made it "difficult to make a living and comply with those steps." He believed "this PIP ties [Younge's] hands *** behind his back and throws him in the water."

¶ 65                                          Urquhart-Bradley

¶ 66 At her deposition, Urquhart-Bradley was shown a November 2015 message referring to Younge, in which Moran asked her "Is this a witch hunt." She recalled that Lewis was "very clear that he wanted Bryan [Younge] out of the group, but we needed concrete evidence of what he said Bryan did not do or did not comply with policies and proceed in place." She agreed that some of Lewis' allegations were not supported by factual evidence.

¶ 67 Urquhart-Bradley recalled that after the PIP was presented to Younge, "he came back with documentation" showing that "some of the information in the [PIP] was inaccurate." She stated: "I don't know that the team did a really good job of vetting the facts that were in that document" and testified that the "PIP was sloppy." She agreed that certain of the information in the PIP was not true.

¶ 68                                    Motion for Summary Judgment

¶ 69 In December 2021, defendants moved for summary judgment. With respect to the tortious interference count, defendants argued Lewis and Schaeffer were covered by a qualified

privilege for corporate officers and directors, which is lost only if their conduct is solely for their personal gain or to harm plaintiff. Defendants urged there was no evidence that either Lewis or Schaeffer prepared the PIP solely for self-interest, maliciously, or without justification. They argued there was evidence that the PIP was at least partially motivated by concerns with Younge's performance. Defendants otherwise argued that the tortious interference claim failed because Younge "voluntarily resigned" from Cushman.

¶ 70　　　　As for Count II (IIED), defendants argued there was no evidence of "extreme" or "outrageous" conduct, as necessary to support this tort. Defendants argued that in the employment context, this tort may be applied in only egregious cases. Defendants asserted there was no evidence that they intentionally misstated Younge's performance deficiencies or that the PIP was intended to harm Young.

¶ 71　　　　As for count III, defendants argued there was no evidence that Cushman negligently supervised Schaeffer or Lewis or had reason to believe they were unfit. Defendants further argued that there was no evidence that any negligent supervision or retention proximately caused Younge's injuries.

¶ 72　　　　On September 14, 2022, the court heard oral argument on defendants' motion for summary judgment. With respect to tortious interference, defendants' counsel argued that when this tort is alleged against corporate officers and employees, a plaintiff must establish that the officers' and employees conduct was done solely for their own self-interest. Defendants urged that if there is "conflicting evidence or motivation" for any of the alleged conduct against Younge, then summary judgment should be granted for defendants. Defendants argued the PIP was created due to "well-documented concerns" about Younge's work, even if there were "secondary motivations."

¶ 73    As for count II, defendants argued there was no evidence of sufficiently extreme or egregious conduct to support intentional infliction of emotional distress.

¶ 74    Regarding count III, defendants noted that Younge had abandoned the "negligent retention" aspect of that claim, so that it was "now just a negligent supervision claim." Defendants argued there needed to be evidence that the employer was on notice of the individual defendant's conduct. Defendants claimed there was no such evidence that Cushman was on notice of problematic conduct by either Lewis or Sheffer. Defendants otherwise argued that there was no evidence that the alleged failure to supervise caused harm, *i.e.*, that the PIP "caused [Younge] to voluntarily resign."

¶ 75    Younge's counsel asserted there were material issues of fact, noting six depositions were taken and thousands of pages of discovery exchanged. With respect to tortious interference, Younge's counsel argued that the qualified privilege for corporate officer and supervisors did not apply to Lewis. Younge otherwise asserted that even if Lewis was subject to the qualified privilege, there was a question of fact as to whether Lewis's conduct was solely in his own personal interest.

¶ 76    Regarding count III, Younge's counsel agreed he was no longer asserting "negligent retention," so the count was limited to negligent supervision. Citing *Doe v. Coe*, 2019 IL 123521, Younge argued that an employer's duty to supervise is general in nature, and that an employer need not be aware of an employee's "particular unfitness" to be liable. Younge argued that Cushman officers knew that Lewis wanted to remove Younge from the H&G group because Younge was affecting Lewis' compensation and opportunities for promotion. Younge claimed that Cushman negligently allowed Lewis to implement the PIP and failed to correct the false information.

¶ 77        At the conclusion of the hearing, the trial court granted defendants' motion for summary judgment. In doing so, it court remarked that the PIP's statements "appear to be for the most part ordinary performance standards." With respect to the tortious interference claim, the court reasoned:

> "The defendants did not terminate his employment. The defendants changed his – changed his sales area – maybe that's not the right thing to call it – these sales group that he was working in and that that caused him to lose the speculative opportunity of a certain amount of commission that he would get in one part of the company rather than the other.
>
> He was not terminated. I think that that reduction or reassignment of sales territory or group is a speculative loss. It perhaps could be ascertained.
>
> There *** isn't any evidence that the defendants' conduct caused his termination, of course; and to the extent to which they changed his assignment area, the group plan, there's no particular claim that that decision is made tort[iou]sly. There is the idea that the decision-makers have a privilege *** to make a business decision on it; and there's no particular evidence that that was *** solely for the purpose of disadvantaging him or to what extent it contributes to that decision at all."

¶ 78        As to count II, the court found that the alleged conduct "is not sufficiently extreme or outrageous even at the pleading level to support a claim for an intentional infliction of emotional

distress." As for count III's negligent supervision claim, the trial court reasoned that this claim failed because it was premised on Cushman's "fail[ure] to prevent these two actors [Lewis and Schaeffer] from engaging in the conduct which caused this claim's Count I and II." The court reasoned that because it found summary judgment proper for the first two counts, Cushman "can't have negligently supervised them."

¶ 79       Younge timely appealed from the final order granting summary judgment.

¶ 80                                            ANALYSIS

¶ 81       For the following reasons, we affirm in part and reverse in part. Specifically, we find summary judgment was properly granted only with respect to the tortious interference claim against Schaeffer and the IIED claim. However, a triable issue of material fact exists with respect to the remaining counts, *i.e.*, tortious interference against Lewis and negligent supervision against Cushman. Thus, we remand for further proceedings on those specific claims.

¶ 82       A trial court may grant summary judgment "only 'if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Epple v. LQ Management, LLC*, 2019 IL App (1st) 180853, ¶ 14 (quoting 735 ILCS 5/2-1005(c)). The trial court must view documents and exhibits in the light most favorable to the nonmoving party. *Id*.

¶ 83       Because summary judgment is "drastic," courts "must exercise extraordinary diligence in reviewing the record so as not to preempt a party's right to fully present the factual basis for its claim." *Northern Illinois Emergency Physicians v. Landau, Omahana & Kropka, Ltd*., 216 Ill. 2d 294, 306 (2005). "Although summary judgment is appropriate if a plaintiff cannot establish an

element of his claim, it should only be granted when the right of the moving party is clear and free from doubt." *Id.*

¶ 84　　We review *de novo* the trial court's decision to grant a motion for summary judgment. *Epple*, 2019 IL App (1st) 180853, ¶ 14. We can affirm on any basis in the record, whether or not the trial court relied on that basis or its reasoning was correct. *Id*. ¶ 15.

¶ 85　　　　　　　　　　　　　　　Tortious Interference

¶ 86　　We turn to the trial court's entry of summary judgment on count I, in which Younge pleaded tortious interference against Lewis and Schaeffer. The elements of the tort of intentional interference with prospective economic advantage are "(1) a reasonable expectancy of entering into a valid business relationship, (2) the defendant's knowledge of the expectancy, (3) an intentional and unjustified interference by the defendant that induced or caused a breach or termination of the expectancy, and (4) damage to the plaintiff resulting from the defendants' interference. [Internal quotation marks omitted.]" *Grako v. Bill Walsh Chevrolet-Cadillac, Inc.*, 2023 IL App (3d) 220324, ¶ 23. This tort may be asserted by at-will employees, who "possess an actionable interest in their 'future relations between' employee and employer." *Id*. ¶ 22 (quoting Restatement (Second) of Torts § 766, cmt. g (1979)).

¶ 87　　To satisfy the first element, "the record must reveal supportive evidence that [plaintiff] had a reasonable expectation of continued employment." *Id*. ¶ 25. There is apparently no dispute that Younge, in fact, had reasonable expectancy of continued employment. Similarly, there is no dispute that defendants had knowledge of that expectancy, fulfilling the second element.

¶ 88　　The bulk of the parties' arguments on count I concern the third element and application of the related qualified privilege. Regarding this element, "a defendant's interest must be intentional and improper." *Id*. ¶ 36. "It is insufficient for a plaintiff to show that the defendant

merely succeeded by ending the business relationship or interfering with the expectancy; rather, 'purposeful interference' – a showing that defendant has committed some impropriety—is needed." *Id.*

¶ 89        This court has recognized a qualified privilege under which "[g]enerally, a corporate officer cannot interfere with the continued employment of an employee because the officer acts on behalf of the corporation." *Harrison v. Addington*, 2011 IL App (3d) 100810, ¶ 52 (citing *Vickers v. Abbot Laboratories*, 308 Ill. App. 3d 393, 411-12 (1999). "Even employees acting on behalf of a corporate employer cannot interfere with a fellow employee's business relationship with the employer." *Fox v. Adams and Associates, Inc.*, 2020 IL App (1st) 182470, ¶ 71 (citing *Vickers*, 308 Ill. App. 3d at 411.

¶ 90        Importantly, however, "[t]his qualified privilege does not apply where officers act solely for their own gain or solely for the purpose of harming plaintiff since such conduct is not undertaken to further the corporation's interest." (Internal quotation marks omitted.) *Harrison*, 2011 IL App (3d) 100810, ¶ 52. To show tortious interference by a corporate officer, the plaintiff must show that the officer's actions were done without justification or maliciously. *Fox*, 2020 IL App (1st) 182470, ¶ 71 (citing *Harrison*, 2011 IL App (3d) 100810, ¶ 52). A claim is properly dismissed if there is no evidence that the defendants acted *solely* for their own benefit or to harm plaintiff. See *id.*, ¶ 73 (affirming dismissal where "there was no evidence that [defendant corporate officer] acted solely to harm Fox"; noting recommendation to terminate plaintiff was reviewed and agreed upon by several other individuals); *Harrison*, 2011 IL App (3d) 100810, ¶ 58 (counts properly dismissed where there was no evidence that corporate officer defendants "acted solely for their own gain or to harm appellant").

¶ 91    In this case, Younge asserts tortious interference against two defendants, Lewis and Schaeffer. We thus consider whether there is any evidence that either defendant acted solely out of self-interest or intent to harm Younge. Keeping in mind that the record is to be construed in favor of the non-movant (Younge), we reach different conclusions with respect to Lewis and Schaeffer.

¶ 92    <u>No Evidence That Schaeffer Acted Solely For Self-Interest or to Harm Younge</u>

¶ 93    Regarding Schaeffer, the qualified privilege for corporate officers clearly applies. Further, the record does not include evidence reflecting that Schaeffer acted solely out of self-interest or intent to harm Lewis.

¶ 94    There is no evidence that Schaeffer was involved in the decision to reduce Younge's territory with respect to the H&G group. Although Schaeffer prepared the PIP and communicated it to Younge, there is no evidence suggesting that he had any improper motive in doing so. Rather, the record shows that he prepared the PIP after Lewis and Andreasen expressed concerns about Younge's performance and integrity and told Schaeffer that they wanted Lewis out of their respective practice groups.

¶ 95    Younge has maintained that statements in the PIP were "fabricated" by Lewis and that Schaeffer should not have included them. Regardless of whether the PIP included false information, the record does not show that in preparing the PIP, Schaeffer acted with self-serving or malicious intent. There is no indication that Schaeffer intentionally included false information in the PIP. To the contrary, he asked Lewis and Andreasen to provide "back-up" for any examples of non-compliance with their practice group protocols.

¶ 96    The record suggests that perhaps Schaeffer could have done more investigation to verify the substance of the factual claims that were included in the PIP. However, even assuming

*arguendo* he should have done more due diligence, that is not equivalent to showing that he acted without justification or maliciously. See *Fox*, 2020 IL App (1st) 182470, ¶ 71.

¶ 97       Further, the record does not show that Schaeffer had any intent to force Younge to leave any particular group, or to leave Cushman altogether. To the contrary, on the day he met with Lewis about the PIP, Schaeffer emailed other Cushman officers that he was "confident [Younge] will turn the corner." This is consistent with Schaeffer's deposition testimony that he believed that Younge could have successfully stayed at Cushman. In short, there is no record evidence that Schaeffer acted solely out of self-interest or with intent to harm Younge. For that reason, summary judgment in favor of Schaeffer on count I was proper. Thus, we affirm the dismissal of this claim (count I) against Schaeffer.

¶ 98                    There Is an Issue of Fact as to Whether Lewis Acted With Improper Motive

¶ 99       We reach a different conclusion, insofar as Younge alleges tortious interference by Lewis. Even assuming the qualified privilege applies, the record (which must be construed in favor of Younge as non-movant) presents a triable issue of fact as to whether Lewis acted tortiously and whether his actions were a proximate cause of Younge's separation from Cushman.

¶ 100      The record makes clear that Lewis, as head of the H&G group, was involved in the decision to reduce Younge's territory. Further, Lewis provided Schaeffer with a significant portion of the alleged H&G group protocol violations that formed the basis of the PIP.

¶ 101      We recognize that to avoid summary judgment, Younge must show some evidence from which a trier of fact could find that the *sole* reason for Lewis' actions was to benefit himself or to harm Younge. While this is a high threshold, the evidence presents a triable issue of fact on this element. The record includes evidence that, if believed, might persuade a factfinder that Lewis

acted out of desire to harm Younge or benefit himself by hastening Younge's departure from the H&G group and Cushman.

¶ 102    It is undisputed that Lewis wanted Younge out of the H&G group. Of course, that fact alone does mean Lewis had any improper motive. However, there was deposition testimony indicating that he had personal animosity toward Younge. Further, deposition testimony and documentary evidence indicated that Lewis was largely, if not primarily, responsible for initiating the PIP. We recognize that there is nothing wrong with addressing an employee's performance issues for valid, business reasons. However, there is evidence that Lewis spurred creation of the PIP with intent to hasten Younge's removal from H&G group (if not Cushman altogether). Indeed, Gray testified that he believed Lewis was preparing the PIP in order to remove him from the H&G group.

¶ 103    More problematic for Lewis is the testimony and documents from which it could be found that he knowingly provided inaccurate or false information for use in the PIP as examples of Younge's alleged violation of company protocols. Urquhart-Bradley testified that Lewis could not provide documentation for certain of the allegations. Further, Gray's testimony corroborated Lewis' claim that the PIP placed restrictions on Younge that hampered his ability to continue to have success in the H&G group.

¶ 104    We also note that Lewis' testimony that Young resigned before they had a chance to discuss issues in the PIP is belied by the emails in the record. The documents show that Younge repeatedly expressed concerns about the accuracy of Lewis' contribution to the PIP to Lewis and others. The record before us indicates that Lewis failed to give any substantive response to the concerns Younge raised.

¶ 105    Taken together, there is sufficient evidence from which a factfinder might conclude that Lewis acted maliciously or without justification to harm Younge's standing in the H&G group or at Cushman.

¶ 106                    There Is a Triable Issue as to Proximate Causation

¶ 107    Our analysis of the tortious interference claim against Lewis cannot end there, as we must also address causation. Defendants suggest that Younge cannot prove causation from the conduct surrounding the December 2015 PIP because (1) Younge "voluntarily" resigned from the H&G group and (2) voluntarily resigned from Cushman, after agreeing to a job offer from Colliers several weeks earlier.

¶ 108    We note that the trial court's ruling emphasized that Younge was not terminated by Cushman. Yet defendants cite no case law suggesting that an employee must be formally terminated in order to prove tortious interference. Here, we recognize that Younge accepted a job offer elsewhere approximately two months after the PIP was presented to him. Nonetheless, we still think there is an issue of fact as to whether the complained-of conduct was a proximate cause of his separation from Cushman, *i.e.*, the termination of his expectancy of a future at the company. That is, a reasonable factfinder could certainly find that Lewis' conduct, particularly with respect to the PIP, drove Younge to depart Cushman. A factfinder could believe Younge's testimony that the PIP harmed his reputation and opportunity within the company such that he believed he needed to find employment elsewhere. That testimony was corroborated by Gray, who testified that the restrictions set forth in the PIP made it impossible for Younge to continue to earn the same compensation at Cushman.

¶ 109    In short, keeping in mind that we must construe the record in favor of Younge, we do not find that defendants were entitled to summary judgment on count I, insofar as it alleged tortious

interference by Lewis. That is, Younge should be able to maintain his tortious interference claim against Lewis.

¶ 110                    The Claim of Intentional Infliction of Emotional Distress Was Properly Dismissed

¶ 111     We turn to address the dismissal of count II, alleging IIED against all defendants. An IIED claim requires proof that "the defendant's conduct was extreme and outrageous, (2) the defendant intended his conduct to cause severe emotional distress or knew that there was a high probability that his conduct would cause severe emotional distress, and (3) the defendant's conduct did, in fact, cause severe emotional distress to the plaintiff." *DiPietra v. GATX Corp.,* 2020 IL App (1st) 192196, ¶ 50.

¶ 112     Conduct is considered "extreme and outrageous" only where it is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Schweihs v. Chase Home Finance*, LLC, 2016 IL 120041, ¶ 51 (quoting Restatement (Second) of Torts § 46 cmt. D, at 73 (1965)). The alleged "extreme and outrageous" conduct is judged by an objective standard. *Duffy v. Orlan Brook Condominium Owners' Ass'n*, 2012 IL App (1st) 113577, ¶ 36. The "outrageousness" of conduct must be determined in view of all the facts and circumstances. *Schweihs,* 2016 IL 120041, ¶ 52.

¶ 113     Our case law indicates that the threshold is particularly difficult to prove in the employment context. "Courts often hesitate to find a claim for [IIED] in employment situations" out of concern that "if everyday job stresses resulting from discipline, personality conflicts, job transfers or even terminations could give rise to a cause of action for [IIED], nearly every employee would have a cause of action. [Citations.]" *Graham v. Commonwealth Edison Co.,* 318 Ill. App. 3d 736, 746 (2000); *Welsh v. Commonwealth Edison Co.* 306 Ill. 148, 154 (1999) ("if

the anxiety and stress resulting from discipline, job transfers, or even terminations could form the basis of an action for emotional distress, virtually every employee would have a cause of action. [Citations.]). "[B]ecause employers must often take actions in the course of business that cause emotional distress, liability [for IIED] in the employment context will only be found where the conduct is truly egregious." *DiPietro*, 2020 IL App (1st) 192196, ¶ 52.

¶ 114　　　On the record before us, we do not find that Younge could prove the first element, as there is not evidence of sufficiently "extreme and outrageous" conduct. Viewing the record in the light most favorable to him, Younge might be able to convince a factfinder that one or more defendants included false information in the PIP and otherwise sought to hasten his departure from Cushman for illegitimate reasons. Although wrongful, we cannot say that this alleged conduct rises to the level of outrageousness to be regarded as "atrocious" and "utterly intolerable." We note that in *DiPietro*, we affirmed summary judgment dismissing an IIED claim premised in part on "manufactured" performance deficiencies, because the "alleged conduct does not cross the line into 'extreme and outrageous,' 'outside all bounds of decency, or truly egregious." *DiPietro*, 2020 IL App (1st) 192196, ¶ 58. Similarly, here too we cannot say that the defendants' alleged conduct was of an "outrageous" character in the employment context, even if it was otherwise improper. See *Welsh v. Commonwealth Edison Co*. 306 Ill. 148, 154 (1999) (affirming dismissal of IIED claim where employees alleged they were demoted or terminated after complaining about safety issues where "[a]lthough the retaliation and indignities [alleged] *** are wholly lacking in social utility, we are unable to conclude that [defendant's] conduct was of such an outrageous character that no reasonable person could be expected to endure it.").

¶ 115　　　Further, even assuming Younge could satisfy the first element of IIED, we do not find evidence of the requisite intent or knowledge on the part of defendants, or that Younge actually

suffered severe emotional distress. There is no evidence that defendants intended or knew that Younge would suffer severe emotional distress from the alleged conduct. Further, although there is evidence that Younge experienced anxiety, "[t]he law intervenes only when the distress inflicted is so severe that no reasonable man could be expected to endure it." *Schweihs*, 2016 IL 120041, ¶ 51. Younge testified that he suffered stress related to his standing at Cushman and feeling that he was forced to find a new employer. Medical records reflect that in October 2015, he reported that his "job has become more stressful" and that he had difficulty sleeping. Yet such employment-related stress does not rise to the level of distress needed to support an IIED claim. See *DiPietro*, 2020 IL App (1st) 192196, ¶ 52; see also *Ulm v. Memorial Medical Center*, 2012 IL App (4th) 110421, ¶ 46 (although the "unexpected deterioration of an employment relationship is understandably stressful for an employee", "no conduct alleged of defendant [employer] would provoke in an ordinary person the kind of disdainful response that defines extreme and outrageous conduct within the employment relationship.") As we do not find evidence from which Younge can establish the elements of IIED, we affirm the dismissal of count II.

¶ 116                    There Is a Triable Issue of Fact Regarding Negligent Supervision

¶ 117          We turn to the dismissal of count III, in which Younge asserted a negligent supervision claim against Cushman for, *inter alia,* failing to properly supervise Lewis and Schaeffer.[1]

¶ 118          Younge maintains that Cushman "breached [its] duty to supervise Lewis and Schaeffer to prevent them from harming Younge" in preparation and implementation of the PIP. Younge argues there is evidence that Cushman "knew exactly what Lewis was doing" to harm Younge

---

[1] Although count III of the complaint also alleged negligent retention, Younge's brief acknowledges that our supreme court has now clarified that negligent supervision and negligent retention are "separate and distinct" causes of action. *Doe v. Coe*, 2019 IL 123521, ¶¶ 54-55. Younge now asserts negligent supervision in connection with count III; he does not assert a claim for negligent retention.

but failed to take "corrective action," even after Younge presented evidence to contradict the allegedly false statements in the PIP. Younge argues that Lewis's conduct was "generally foreseeable to Cushman management," who knew of the "adversarial relationship" between Lewis and Younge.

¶ 119      In arguing that this cause was properly dismissed, defendants assert that Younge cannot hold Cushman liable based solely on his "disagreement with his supervisors" regarding the PIP. Defendants suggest there can be no finding of negligent supervision because Lewis and Schaeffer had "exemplary" reputations at Cushman and were never removed from their positions. They point out that Lewis remained a "highly valued" employee at Cushman even after Younge's PIP. Defendants otherwise argue there is no evidence that Cushman failed to supervise either Lewis or Schaeffer with respect to Younge.

¶ 120      Construing the evidence in favor of Younge, we think there is a triable issue of fact as to negligent supervision.

¶ 121      The elements of a negligent supervision clam are that (1) the defendant had a duty to supervise the harming party, (2) the defendant negligently supervised the harming party, and (3) such negligence proximately caused the plaintiff's injuries." *Doe v. Coe*, 2019 IL 123521, ¶¶ 52, 61. "Whether a duty exists in a particular case is a question of law, whereas "[b]reach of duty and causation are generally findings of fact." *Vancura v. Katris,* 238 Ill. 2d 352, 373-74 (2010).

¶ 122      Importantly, our supreme court in *Doe* explained there is a distinction between a duty to *control* and a duty to *supervise*. *Doe*, 2019 IL 123521, ¶¶ 57-58. A duty to control "can arise when the employer has reason to know or suspect that a certain employee or employees will engage in potentially dangerous or tortious conduct they are not prohibited from doing so." *Id*. ¶ 57. "An employer's duty to supervise, in contrast, is general in nature. An employer has a duty

to supervise all employees; the extent to which she must do so depends on many factors, such as the work performed, the employees performing it, the size of the business, the type of work, and the employer's clients, among others." *Id*. ¶ 58. In any case, *Doe* explicitly held that "an employer has a duty to generally supervise her employees to make sure that they engage in appropriate behavior and follow the law and the employer's rules." *Id.* ¶ 59.

¶ 123    Negligent supervision does not require that the "supervisor have prior notice of a particular unfitness" by an employee. *Doe*, ¶ 61. Rather, "to impose a duty to supervise, only general foreseeability is required in an employment context." *Id*.

¶ 124    As to the first element of negligent supervision, we conclude Cushman had a duty to supervise Lewis and Schaeffer to implement Younge's PIP in a non-tortious manner. In this regard, we note defendants' argument that Younge has not identified "evidence of conduct by Lewis and Schaeffer that would give rise to a duty to supervise Lewis and Schaeffer differently." Defendants appear to suggest Younge must show Cushman had a specific reason to believe Lewis or Schaeffer might engage in wrongful conduct. But *Doe* made clear that "only general foreseeability" gives rise to a duty to supervise, and that every employer has a general duty to make sure their employees engage in "appropriate behavior and follow the law and the employer's rules." *Id*. ¶ 59. Accordingly, Cushman had a duty to supervise Lewis and Schaeffer to be reasonable in drafting and implementing the PIP through "appropriate behavior" and in a way that "follow[ed] the law and the employer's rules." *Id.*

¶ 125    Regarding the remaining elements of the tort, we must assess whether there is evidence creating a triable issue of fact as to whether "the defendant negligently supervised the harming party," and whether "such negligence proximately caused the plaintiff's injuries." *Doe*, 2019 IL 123521, ¶ 52. We believe there is, for largely the same reasons discussed with respect to the

tortious interference claim against Lewis. Viewing the record in a light favorable to Younge, there is sufficient evidence in the record from which a factfinder might conclude that Cushman (through Schaeffer or other Cushman officers) failed to supervise Lewis in connection with the preparation and implementation of the PIP, thus permitting Lewis to tortiously interfere with Younge's employment at Cushman.

¶ 126      In this regard, we note there is deposition testimony indicating that it was known that Lewis had personal animosity against Younge and wanted Younge out of his group. Gray specifically testified that after speaking with Lewis, he believed the PIP was intended to remove Younge from the H&G group. It is not disputed that Lewis provided a significant portion of the information used in the PIP that was compiled by Schaeffer. The testimony suggests that Schaeffer relied on the accuracy of information from Lewis without independently verifying it. After the PIP was presented to him in early December 2015, Younge repeatedly challenged the veracity of that information in emails to Lewis and other Cushman officers. Importantly, at least one Cushman officer (Urquhart-Bradley) acknowledged that the PIP contained inaccurate information, and she characterized its preparation as "sloppy." The record shows that despite numerous emails from Younge to Cushman officers in the weeks after the PIP was presented to him, the PIP was not revised.

¶ 127      Taken together, we think this evidence presents a triable issue of fact as to whether Cushman negligently supervised Lewis and Schaeffer in the creation and implementation of the PIP. Further, there is sufficient evidence from which a trier of fact could conclude that this negligent supervision damaged Younge by harming his prospects at Cushman and compelling him to seek employment elsewhere. We again note that, while Younge was not terminated before accepting a job elsewhere, a finder of fact might nonetheless accept Younge's testimony that he

felt compelled to leave and accept lower-paying employment. That is, a jury might conclude that Cushman's conduct surrounding the PIP was a proximate cause of his harm.

¶ 128     Accordingly, we conclude that summary judgment should not have been granted with respect to the negligent supervision claim in count III.

¶ 129                                    CONCLUSION

¶ 130     To summarize, we conclude that: the tortious interference claim (count I) was properly dismissed as to Schaeffer only. However, we reverse dismissal of the tortious interference claim against Lewis. We further conclude that trial court properly dismissed count II, for intentional infliction of emotional distress. However, we reverse the trial court's entry of summary judgment on count III, for negligent supervision against Cushman. We thus remand for further proceedings on the remaining viable counts: tortious interference against Lewis and negligent supervision against Cushman.

¶ 131     Affirmed in part and reversed in part.